# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 99-1869

_____

| | | |
|---|---|---|
| R.D. Jones, | ) | |
| | ) | |
| Defendant - Appellant, | ) | Appeal from the United States |
| | ) | District Court for the Eastern |
| v. | ) | District of Arkansas |
| | ) | |
| Thuworn Shields, | ) | |
| | ) | |
| Plaintiff - Appellee. | ) | |

_____

Submitted: December 17, 1999
Filed: March 23, 2000

_____

Before **RICHARD S. ARNOLD,** and **LOKEN,** Circuit Judges, and **WEBB,**[1] District Judge.

_____

---

[1] The **HONORABLE RODNEY S. WEBB,** Chief Judge, United States District Court, District of North Dakota, sitting by designation.

**WEBB,** District Judge.

## I.

Thuworn Shields, an inmate incarcerated at the Cummins Unit of the Arkansas Department of Corrections (ADC), brought this pro se Section 1983 action against corrections officer R.D. Jones, alleging Jones inflicted cruel and unusual punishment upon Shields by unjustly spraying Shields with "capstun." Jones appeals interlocutory the District Court's denial of his motion for judgment as a matter of law based upon qualified immunity. We reverse.

## II.

A Magistrate Judge conducted an evidentiary hearing to determine whether Shields' allegations warranted a jury trial.[2] The following facts were adduced, which we view in the light most favorable to Shields.

Shields testified he was working in the prison kitchen on March 12, 1996, when his supervisor instructed him to mop the floor. Shields refused, prompting the supervisor to order him to the east kitchen riot gate, where he was met by Jones. Jones informed Shields he would be placed on "disciplinary court review" (DCR) for his refusal to work, and ordered Shields to the hall desk. Shields "questioned"

_____

[2] Where, as here, an evidentiary hearing resembles a summary judgment motion with live evidence, the proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Johnson v. Bi-State Justice Ctr., 12 F.3d 133, 135 (8th Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The court must apply the proper standard of proof, avoid credibility determinations, believe the inmate's evidence, and draw all justifiable inferences in his favor. Id. (citing Anderson, 477 U.S. at 255).

this order, but Jones rebuked "you just do like you're told." Shields proceeded to the desk and provided Jones his name and prisoner number.

Jones then ordered Shields to his barracks. As Shields departed, Jones asked "Inmate Shields, what barracks you out of?" Shields turned and replied, "10 Barracks," and continued toward the same. Jones repeated the question, "with . . . aggressiveness in his voice." When Shields turned to respond, Jones sprayed Shields in the face with capstun. Shields was immediately pushed against the wall and handcuffed by Officer Robert Spencer. Shields remained against the wall for "10 or 15, maybe 20 minutes[,] . . . . just standing there . . . . drooling . . . snot and everything."

After this time, Spencer delivered Shields to the infirmary, where a nurse flushed his eyes with water. Shields was then escorted to administrative segregation, but returned a short time later complaining of lingering effects. A dentist's assistant flushed Shields' eyes with water again and directed officers to take him outside for air. While outside, the wind agitated Shields' eyes. By this time very upset, Shields was taken to mental health for about 20 minutes before returning to administrative segregation.

Shields estimated he suffered the effects of the capstun for "a good 30 or 45 minutes." Shields returned to the infirmary the following day complaining his left eye "felt irritable," but admitted the attending nurse "found nothing wrong." A medical report indicated Shields visited the infirmary ostensibly to have a wart removed. Shields contested the accuracy of this report.

Shields was found to have committed two disciplinary violations during the incident; one for his refusal to work (which he did not contest), and another for failure to obey an order from Jones, and use of abusive, obscene language toward

3

Jones.[3]  Shields was docked 60 days good time for the former and 90 days for the latter.

Jones did not testify at the hearing, but portions of his incident report were read into the record.  According to Jones, Shields objected profanely when ordered to his barracks and informed he would be placed on DCR.  When Jones stopped Shields and repeated the order, Shields "got very loud and became argumentative."  Jones sprayed Shields with capstun in response to this outburst.

Officer Spencer testified at the hearing.  Spencer recalled witnessing Shields "charge toward" Jones, whereupon Jones "pulled out his . . . capstun, and gave [Shields] a small burst," lasting no longer than "half a second."  Spencer then handcuffed Shields and immediately delivered him to the infirmary, where a nurse directed Spencer to take (an unruly) Shields to the shower.  Spencer subsequently heard Shields tell the nurse he was "fine," and returned Shields to administrative segregation.  Spencer noted Shields was much larger than the 5'6" Jones.

Rex Gaylon Lay, the Assistant Warden in charge of security at the Cummins Unit, also testified.  Lay stated the use of capstun is authorized "[t]o prevent injury to [oneself], a third party, inmate on inmate, to compel an inmate to move from one area to another if he's refusing to move[][,]" and to prevent an escape.  Lay also stated corrections officers must be certified in the use of capstun, and must undergo a training regimen during which they are sprayed with the agent.  Lay recalled being sprayed with capstun during an altercation; "[i]t stung for a little bit, you know, for a few minutes . . . , but it kind of dissipated and went away."

Darlene Hall, an ADC training officer and instructor on the use of chemical

---

[3]  Shields maintained Jones violated an ADC regulation requiring officers to warn inmates prior to administering chemical agents or non-lethal weapons.

agents, also testified. Hall stated capstun is a non-lethal agent composed of cayenne pepper (ground to an oil base) and alcohol. An officer typically dispenses the agent in a one-second burst from a small can with a trigger, and the spray normally ranges about three feet.[4]

Hall stated capstun is water soluble, and produces no permanent effects. After a direct spray to the face, effects upon the eyes, nose and mouth normally "clear" within 10 minutes. Effects may linger when the agent is trapped in the pores of the skin, but even under such circumstances, Hall could not recall anyone "hav[ing] any problems after 45 minutes." Hall had sprayed some 300 employees with the agent, including herself.

At the close of Shields' testimony, and again at the close of the hearing, Jones moved for judgment as a matter of law, arguing Shields' injuries were de minimis for purposes of the Eighth Amendment, and Jones was entitled to qualified immunity. The Magistrate Judge recommended the district court deny the motion, finding the pain and suffering alleged by Shields amounted to a cognizable injury, and finding questions of material fact remained surrounding what knowledge Jones possessed, and what occurred during the incident, precluding a grant of qualified immunity. Reviewing de novo, the district court adopted the Magistrate Judge's recommendation, and this appeal ensued.

---

[4] Hall verified Jones was trained and certified in the use of capstun at the time of the incident. Hall stated ADC regulations did not require Jones to issue a warning prior to using capstun if time did not permit him to do so, and officers are trained to handcuff an inmate immediately after spraying capstun for purposes of safety.

5

## III.

We have jurisdiction to review interlocutory a denial of qualified immunity to the extent it turns on an issue of law, see Mitchell v. Forsyth, 472 U.S. 511, 525, 530 (1985); Mettler v. Whitledge, 165 F.3d 1197, 1202 (8th Cir. 1999), but not where it turns upon the merits of the case or the sufficiency of the evidence, see Johnson v. Jones, 515 U.S. 304, 313 (1995); Lyles v. City of Barling, 181 F.3d 914, 916-17 (8th Cir. 1999). We review the denial of qualified immunity de novo. Estate of Davis ex rel. Ostenfeld v. Delo, 115 F.3d 1388, 1394 (8th Cir. 1997).

When qualified immunity is asserted in a § 1983 action, we "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all . . . ." Wilson v. Layne, 119 S. Ct. 1692, 1697 (1999)(citing Conn v. Gabbert, 119 S. Ct. 1292, 1295 (1999)); County of Sacramento v. Lewis, 118 S.Ct. 1708, 1714 n.5 (1998). See Berryhill v. Schriro, 137 F.3d 1073, 1075 (8th Cir. 1998). Only then do we ask "whether that right was clearly established at the time of the alleged violation." Layne, 119 S. Ct. at 1697 (citing Conn, 119 S. Ct. at 1295); Lewis, 118 S. Ct. at 1714 n.5 (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

Jones contends the district court erred when it answered the constitutional question in the affirmative.[5] Jones argues the pain Shields experienced was de minimis for purposes of the Eighth Amendment, and further claims his actions were neither repugnant to the conscience of mankind, nor malicious or sadistic. Shields maintains he suffered extreme pain, and the application of capstun in this case was malicious, sadistic, and served no useful purpose. We agree with Jones, and hold

___

[5] Jones also argues the district court erred when it concluded Shields' claimed injuries sufficed for purposes of 42 U.S.C. § 1997e(e). Given our disposition of Shields' Eighth Amendment claim, we need not reach this issue.

6

Shields has failed to establish an Eighth Amendment violation.

The Eighth Amendment protects incarcerated prisoners from cruel and unusual punishment, and this protection is grounded upon their right to be free from unnecessary and wanton infliction of pain at the hands of correctional officers. Parkus v. Delo, 135 F.3d 1232, 1234 (8th Cir. 1998)(citing Hudson v. McMillian, 503 U.S. 1, 5 (1992)). Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny, however. Only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 319 (1986) (citations and internal quotations omitted). Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the "core judicial inquiry" is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson, 503 U.S. at 6-7 (citing Whitley, 475 U.S. at 320-21). Factors which inform this inquiry include the need for the application of physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate. Id. at 7 (citing Whitley, 475 U.S. at 320).

Not every malevolent touch by a prison guard gives rise to a federal cause of action. Id. at 9 (citations omitted). "The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (citing Whitley, 475 U.S. at 327)(internal quotations omitted). Serious or permanent injury is not required to make out an Eighth Amendment claim. Berryhill, 137 F.3d at 1076-77 (citing White v. Holmes, 21 F.3d 277, 281 (8th Cir. 1994)). Some actual injury must be shown, however, and we consider the extent of the pain inflicted in order to determine whether a constitutional deprivation has occurred. Id. at 1076-77 (citing White, 21 F.3d at

7

281).

Viewing the evidence in Shields' favor, we conclude Jones' administration of capstun in this prison setting resulted in de minimis injury for Eighth Amendment purposes. Despite somewhat elaborate claims of pain, Shields' own testimony reveals the effects of the capstun cleared within 45 minutes; he was twice taken to the infirmary and treated with water during that period, and; a medical examination the day after the incident revealed no lingering effects. See, e.g., Samuels v. Hawkins, 157 F.3d 557, 558 (8th Cir. 1998) (per curiam) (affirming summary judgment in favor of detention center employees where an inmate lacked medical evidence of actual injury caused by liquid thrown into his eyes). This comports with the undisputed testimony of Darlene Hall, indicating capstun is a water-soluble agent composed of natural ingredients, the effects of which last no longer than 45 minutes in an extreme case.

Shields cites Hickey v. Reeder, wherein we reversed a district court's ruling that the use of a stun gun to force an inmate to comply with a housekeeping order did not constitute cruel and unusual punishment. In so doing, we found the stun gun inflicted "exactly the sort of torment without marks with which the Supreme Court was concerned in [Hudson v. McMillian], and which, if inflicted without legitimate reason, supports the Eighth Amendment's objective component." Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir. 1993)(citations omitted). Shields argues the capstun in this case, like the stun gun in Hickey, left no physical marks but nevertheless caused physical injury.

In Hickey, however, we reached the foregoing conclusion in part due to the defendant's admission that "a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless." Id. This stands in sharp contrast to the undisputed testimony in this case regarding the effects of capstun. Moreover, the inmate in Hickey complained of continuing

8

discomfort from the stun gun.  Id. at 757 n.5.  Shields makes no such claim, nor produces any evidence he suffered to the extent or duration we found objectionable in Hickey.

Nor do we find the type of force used in this case "repugnant to the conscience of mankind."  In Hickey, we recognized "summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy," and we cited Soto v. Dickey in support of this proposition.  Id. at 759 (citing Soto v. Dickey, 744 F.2d 1260 (7th Cir. 1984), cert. denied, 470 U.S. 1085 (1985)).  In Soto, the Seventh Circuit held the use of mace, tear gas, or other similar chemical agents, does not constitute cruel and unusual punishment when reasonably necessary to subdue a "recalcitrant prisoner," even where the prisoner is locked in his cell or in handcuffs.  Soto, 744 F.2d at 1270.  Indeed, our sister circuits have approved the use of mace in small quantities to control a "recalcitrant inmate."  Id. at 1270-71 (citing cases).  See Baldwin v. Stalder, 137 F.3d 836, 841 (5th Cir. 1998); Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996) (citing cases); Spain v. Procunier, 600 F.2d 189, 195-96 (9th Cir. 1979) (citing cases) ("[U]se of nondangerous quantities . . . in order to prevent a perceived future danger does not violate 'evolving standards of decency' or constitute an 'unnecessary and wanton infliction of pain.'").[6]  As the Fourth

_____

[6]  Our review unearthed several unpublished decisions to this effect.  See Thomas v. Greene, No. 99-3179, 1999 WL 1253102, at **1-2 (6th Cir. Dec. 17, 1999) (affirming the dismissal of an excessive force claim by an inmate maced when he refused to consent to a strip search; the inmate's clothes were immediately removed after the macing, and he was immediately escorted to the shower area to bathe); Washington v. Cambra, No. 96-16925, 1998 WL 840946, at *1 (9th Cir. Nov. 23, 1998) (citing Spain, 600 F.2d 195-96) (affirming summary judgment in favor of prison officials who pepper sprayed an inmate who refused to exit his cell or submit to handcuffs; the inmate offered no evidence indicating prison officials

9

Circuit explained in <u>Williams</u>, "[a] limited application of mace may be much more humane and effective than a flesh to flesh confrontation with an inmate. Moreover, prompt washing of the maced area of the body will usually provide immediate relief from pain." <u>Williams</u>, 77 F.3d at 763 (citing <u>Soto</u>, 744 F.2d at 1262).

We similarly conclude a limited application[7] of capstun to control a recalcitrant inmate constitutes a "tempered response by prison officials" when compared to other forms of force. <u>Id.</u> at 763. <u>See</u> <u>Whitley</u>, 475 U.S. at 321. Used

_____

used dangerous amounts of spray); <u>Bennett v. Cambra</u>, No. 97-15367, 1997 WL 599527, at *1 (9th Cir. Sept. 26, 1997) (affirming summary judgment in favor of prison officials who pepper sprayed an inmate who refused to relinquish a food tray from his cell; the spray was used in a good faith effort to maintain discipline and in an amount necessary under the circumstances, and the inmate produced no competent evidence that the prison officials acted maliciously or sadistically); <u>Wallace v. Barr</u>, No. 97-6060, 1997 WL 314437, at *1 (4th Cir. June 10, 1997) (affirming summary judgment in favor of corrections officers who used a small quantity of mace to control a recalcitrant prisoner); <u>Williams v. Scott</u>, No. 96-2184, 1997 WL 312273, at *1 (7th Cir. June 5, 1997) (affirming summary judgment in favor of prison guard who administered a two-second burst of mace after an inmate refused to stop kicking his cell door; the inmate admitted the guard used mace only to restore discipline after the inmate refused a direct order, and did not claim the mace was used to inflict harm or in dangerous quantities); <u>Williams v. Dehay</u>, Nos. 9407114, 94-7115, 1996 WL 128422, at **2-3 (4th Cir. Mar. 21, 1996)(affirming summary judgment based upon de minimis injury where immediately after being maced, effects of which were minimal and lasted only 30 minutes, a pretrial detainee was given soap, ice and water to clean up).

[7] Shields does not allege Jones administered excessive or dangerous quantities of capstun.

10

in such manner and purpose, its application should "rarely be a proper basis for judicial oversight." Cf. Colon v. Schneider, 899 F.2d 660, 669 (7th Cir. 1990).

Finally, Shields has failed to establish Jones' conduct was "malicious or sadistic." According to Shields' own testimony, Jones administered capstun after Shields refused a direct order from his supervisor and "questioned" an order from Jones, conduct which formed the basis for two disciplinary violations. Shields was neither handcuffed nor secured in any way during this encounter, and was apparently much larger than Jones.[8] Shields does not argue Jones used capstun in excessive or dangerous quantities, and concedes he was afforded medical treatment within minutes of being sprayed. This record "falls far short" of showing there was "no plausible basis for [Jones'] belief that this degree of force was necessary." Whitley, 475 U.S. at 323.

## IV.

We hold Shields has failed to establish an Eighth Amendment violation. Accordingly, we need not proceed with the qualified immunity analysis. See Layne, 119 S. Ct. at 1697 (citing Conn, 119 S. Ct. at 1295); Lewis, 118 S. Ct. at 1714 n.5 (citing Siegert, 500 U.S. at 232). We reverse the District Court's denial of Jones' motion for judgment as a matter of law and remand with instructions to dismiss.

RICHARD S. ARNOLD, Circuit Judge, dissenting.

---

[8] Under these circumstances, Jones may well have "reasonably perceived" Shields to be a threat to his safety. See Whitley, 475 U.S. at 321.

11

I would hold, as did the Magistrate and District Judges, that judgment as a matter of law on the basis of qualified immunity is not appropriate in this case. Accepting as true Thuworn Shields's version of the facts, I think an objectively reasonable officer would know that spraying an inmate with capstun for no reason was excessive force. Moreover, the injury alleged by Shields was more than de minimis, and genuine questions of material fact regarding the knowledge and conduct of R. D. Jones, who did not testify at the hearing, preclude summary judgment on qualified-immunity grounds. I therefore respectfully dissent.

Today the Court holds that Shields failed to show more than a de minimis injury, and that Jones's use of capstun was a justified and "tempered response" to control the "recalcitrant inmate" Shields. Ante at 14. The Court appears to be reviewing this case as if it were a jury. It looks at the evidence and draws reasonable inferences in favor of the defendant, rather than the plaintiff. I believe Shields's testimony, which must be taken as true in the present context, was sufficient to create a genuine issue of fact.

Shields testified as follows:

BY THE COURT:

A:     After – after the last order, which was to mop the back floor, he [Mr. J. Carbage] told me – he instructed me to – if I was quitting, to place my mop down and I did so. And he told me to go to the entrance of the kitchen, the east side kitchen riot gate. And there I was met by Sergeant R. D. Jones, which instructed me to go to the hall desk and that I was being placed on DCR.

I asked him what was the purpose of me going into the hall desk and he said you just do like you're told. I said, "Yes, sir," and I went on to the hall desk.

12

When I got there, he asked me my name and ADC number. And I gave it to him. And then, he said, "Go to your barracks and don't come back out unless you're called for before going to chow."

And, I said, "Yes, sir."

So, I started east, because I was in 10 Barracks at the time, which is on the east hall. I headed towards the barracks, and Mr. Jones called me and asked me, said, "Inmate Shields, what barracks you out of?"

I turned around and replied, "10 Barracks." I then – I didn't say anything else, I just turned around and proceeded to go on to my barracks.

And then he said, "Inmate Shields, what barracks you out of?", with like aggressiveness in his voice. And I turned around to respond and he sprayed me. And I said, "Hey, wait, wait a minute, what is going on?"

And, the next thing I know, I'm being pushed and then I get up against the wall and I feel someone grab my left arm and forces it up my back until I'm handcuffed. And then, I'm just standing there questioning, "Hey, Man, what is going on; why did you do this?" you know.

And then, I stood in the hall for probably about, oh, man, it was 10 or 15, maybe 20 minutes, I mean, because I remember, I mean, I don't know any polite way of putting it. But, I was just

13

drooling and snot and everything, just all, you know – I – I couldn't do anything for myself. And I was just standing there and asking them to take me to the infirmary. And, no one was answering me. No one would say anything.

Then, all of sudden, somebody grabbed me by the arm and said, "Come on," and it was this Officer Spencer and they – he took me to the infirmary. And then, when I got there, Nurse Coleman asked me, she said "What is happening here, what's going on?" And, I tried to explain–

. . .

Okay. And, when Nurse Coleman requested as to what had happened, I – I tried telling her, but the chemical was taking my breath. And it was just causing me – I couldn't function properly. So I just told her, I said "R. D. Jones sprayed me for nothing, and I don't – I don't know why, but he just – he just tripped out." You know, I remember saying that.

And she said, "Well, I'm going to document it down here and we're going to take care of you." And they took me into the examining room and I don't know what they really did besides flush my eyes out with water and then told the officers to go ahead and take me to the barracks.

But, I didn't go to the barracks. I went to administrative segregation, which is a lock down part of the institution at the Cummins Unit.

14

And when I got there, that's where I met Mr. Harvey. He was the officer that was working 14 and 16 Barracks floor during that time. And I guess Spencer left. And this officer took me from that point. And that's when – I don't really remember what happened. I'm only – I can only say he – what he said – but, there again, that's another one of my witnesses that the Attorney General's office is saying that they can't – they can't find.

Q:     This is this Officer Hardrey?

A:     Harvey.

Q:     Harvey?

A:     Yes, sir. But he said that I had blacked out. And when I did – or if I did, I really don't know, but I remember being taken back to the infirmary because I was suffering from a pain in my left side of my back and that the chemicals was still bothering me. And I guess I became in a – in a upset state at that point. And then, I was taken to Mental Health to see Mr. – Mr. Moore, Mr. Jerry Moore.

Q:     So you went back to the infirmary first?

A:     Yes, sir.

Q:     And then to mental health?

A:     Yes, sir.

15

Q: Okay. How long were you at the infirmary?

A: The second time?

Q: Yes, sir.

A: I really – I really can't – I really can't say. I – I don't know, 10 -- about 10 minutes maybe or less, I really don't know.

Q: Do you remember anything that they did for you, or any treatment or examination?

A: Oh, yeah. She – she and the dentist's assistant, Ms. Christie which she's not – she's not in the case, but her and Ms. Cristie flushed my eyes again and told the officers to take me outside for air. And, yeah, I forgot about that – yeah, they took me outside for air. And then when they took me outside, then that's when they took me to Mr. Moore's office.

Q: So they did take you outside, but then they took you to Mr. Moore's office.

A: Yes, sir. Because I – I complained of the wind blowing, you know, it was hurting. It was burning, so you know. Then I went to Mr. Moore, and Mr. Moore took notes of what happened. Or what I explained to him, rather, and then they took me back to 14/16 and locked me up.

Q: How long did you stay with Mr. Moore? Do you remember? Can you give me a rough estimate?

16

A: Oh, about – about 20 minutes. About 20 minutes there. He was trying to get me to calm down, because I was, you know, like I said, about the second time I went to the infirmary, I was upset. I was being punished for nothing, sprayed.

. . .

A: But, Mr. Jones never gave me any orders except to go to my barracks, and I complied with them by heading east, going to my barracks. And I – I can't – I don't know what he was thinking about or what his intentions was, but they couldn't have been good because he just turned – like I say, I turned around and replied the first time and attempted to do so the second time, and he just – just sprayed me. Just sprayed me.

. . .

Q: I wanted to ask you how long it took before the effects of being sprayed wore off?

A: All right. I sat up in that cell for – for a while. I really – I really don't want to put any time on it. But if I had to, I'd have to say a good 30 or 45 minutes.

Q: Okay.

A: And you know, that was with me still repeatedly putting water on it, and put a towel on my face. And just let it sit there. That "cap stun," it's a meaningful effect for compliance. I mean, I have to say that myself. But being used improperly, that's a

17

different story.

Q: The next day, were the effects completely gone?

A: All except for my left eye. I still felt irritable about it. And I did go to the infirmary, but they told me to put in a sick call, and when I put in the sick call, I had hoped to go back to see Ms. Coleman. But I didn't see her, I saw Nurse Cunningham. Yeah, Nurse Cunningham, I saw her. And, she looked over my eye and said she didn't see anything wrong with it. And – but –

. . .

BY MS. INFANTE:

Q: And after they were washed out, you didn't have any problem with your eyes anymore; isn't that correct?

A: No. No, that's no correct.

Q: In fact, you told Ms. Coleman when she asked you if you were okay, and you said you were okay?

A: Oh, yeah. I mean, yeah, I was okay. But I was still suffering, I was still burning and irritated. I mean, yeah, I mean, yeah, I – easy for me to say, yes I'm okay, to have the problem resolved for that moment. But I'm still in pain, that doesn't stop my pain.

App. Appendix, 6 - 27.

18

Shields presented enough evidence that the force used against him was excessive. Force was used for no reason. When force is used without necessity, there exists an inference of a wanton infliction of pain. Excessive force against a prisoner violates the Eighth Amendment, even where no significant injury exists. See Hudson v. McMillian, 503 U.S. 1, 9 (1992). Shields demonstrated that his pain was above the level of de minimis. I am at a loss to understand how the Court can uphold a judgment as a matter of law on this record. To be sure, Shields had been recalcitrant, but at the time he was sprayed with capstun he was being completely obedient. There was no justification for the use of additional force at that point. Significantly, Jones, the defendant officer whose actions are being complained about, did not even testify. If Shields's testimony by itself were not enough, surely the trier of fact could draw an adverse inference from the absence of testimony by Jones.

I do not question that capstun can be a valuable means of preserving discipline among inmates. It is also doubtless true that the harm inflicted by capstun is less serious than harm that might be inflicted by other means of disciplinary control. But the effect of the Court's opinion in this case is to give a blank check to prison employees to spray capstun in inmates' faces for no reason. Physical force cannot legitimately be applied to punish an inmate for past misconduct. It should be used only to compel compliance with a lawful order or to quell current disobedience. I suspect that the Magistrate and District Judges who handled this case will be as startled as I am at the result the Court reaches today. It is possible, perhaps even likely, that a jury would return a verdict for defendants, with or without Jones's testimony, but I cannot agree that sufficient facts to create a jury issue have not been made out. I respectfully dissent.

19

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.