Ben KALKA, Appellant,

v.

Kathleen HAWK, et al., Appellees.

No. 98–5485.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 11, 2000.

Decided June 23, 2000.

Marina Utgoff Braswell, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney. Dara A. Corrigan, Assistant U.S. Attorney, entered an appearance.

Before: WILLIAMS, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Opinion concurring in part and concurring in the judgment filed by Circuit Judge TATEL.

RANDOLPH, Circuit Judge:

Ben Kalka was a federal prisoner. After his conviction in 1991, he was incarcerated in seven different Federal Correctional Institutions ("FCIs"). Kalka claims to be a long-time member of the American Humanism Association ("AHA"). He alleges that at six of the prisons, he attempted to form "humanist groups within the chapels of the prisons they maintain," Complaint at 12, but with one exception, the wardens refused to recognize humanism as a religion and therefore turned him down.[1] Acting *pro se*, Kalka brought this action for an injunction and damages against officials of the Bureau of Prisons, claiming that they had violated and were still violating the religion clauses of the First Amendment. We affirm the district court's grant of summary judgment in favor of the defendants.

I

Each federal prison has a Religious Services Department headed by a chaplain responsible for managing the institution's religious activities. Prison chaplains are also charged with deciding whether to introduce new religious components to the Department. When a decision on an inmate's request cannot be reached locally,

William M. Hohengarten, appointed by the court, argued the cause and filed the briefs as amicus curiae on the side of appellant.

Ben Kalka, appearing pro se, was on the briefs for appellant.

---

1. Kalka claims that he was allowed to start one AHA chapter at FCI–Tucson, in 1994. The Bureau of Prisons submitted evidence to the contrary.

the request is passed on for review by the Religious Issues Committee at BOP's Central Office in Washington, D.C. The Committee then forwards its recommendations to the prison's warden, who makes the final determination. *See generally* Bureau of Prisons Program Statement No. 5360.07, *Religious Beliefs and Practices* (effective Aug. 22, 1997).

Although each prison evidently maintains a "chapel," we do not know exactly what this entails. A "chapel" might simply be a corner of an ordinary room set aside at certain times for religious services. (In a letter to the warden at FCI–Jesup, Georgia, the prison chaplain wrote of a "multipurpose auditorium (Chapel area).") BOP regulations require only that space be made available.

The most recent events leading to this lawsuit occurred when Kalka applied to establish a chapter of the American Humanism Association under the aegis of the Religious Services Department at FCI–Jesup, Georgia. Kalka supported his application with information about humanism, including portions of essays, excerpts from AHA publications, and a copy of a book entitled *The Philosophy of Humanism* by Corliss Lamont.

After reviewing these items, Chaplain David W. Fox forwarded them to the warden, Tom L. Wooten, along with a memorandum discussing Kalka's request "to have counselors and celebrants enter the prison to conduct a 'non-theistic,' secular and naturalistic approach to philosophy." The chaplain recommended *referring* Kalka's application to the Central Office Religious Review Committee. He listed several matters of concern for the warden's consideration, among which were the AHA's non-theistic nature; humanism's lack of ceremonial rituals; the description of humanism as a philosophy; and Kalka's classification of his faith choice as Jewish. Chaplain Fox also mentioned that the AHA "is not associated with any type of spirituality or higher being, as is espoused by our groups currently meeting under the guide of [the] religious services department."

Heeding the chaplain's suggestion, warden Wooten transferred Kalka's request to the Central Office Religious Review Committee. In his transmittal letter, the warden wrote that he had "serious concerns" about recognizing humanism as a religion. In particular, he noted that the materials Kalka presented clearly document the AHA's "philosophical and educational nature" and that "[t]he group does not appear to ascribe to any type of Deity, God, or Spiritual Advisor."

The Religious Issues Committee conducted an extensive review of Kalka's submission. In the information he provided, humanism is described alternately as a philosophy, a non-theistic religion, a life stance and a world view. A letter from a humanist association president notes that even among humanists, the question whether humanism is a religion is a "contentious one."

Corliss Lamont's book, *The Philosophy of Humanism*, considered "a standard text and reference" on secular humanism, describes humanism as "a philosophy that advocates happiness in this life rather than hope for a heaven in an afterlife." Lamont defines humanism as "a philosophy of joyous service for the greater good of all humanity in this natural world and advocating the methods of reason, science, and democracy." Among humanism's central tenets, Lamont lists a rejection of the supernatural; the belief that the universe is self-subsisting; that humans are a part of the natural universe; and that there is no life after death. The Lamont excerpt Kalka submitted labels humanism "a many faceted philosophy" but makes no reference to any religious component.

Kalka had also submitted a portion of an essay by Gerald A. Larue entitled "Positive Humanism." In it Larue writes: "it is absolutely essential that we continue to express the impact of rational and scientific analysis on modern life and thought."

Among other things, the author calls upon humanists to "take stands against sloppy thinking, against the imposition of ancient interpretations on modern life and living, [and] against the efforts to impose religious teachings and interpretations on society." Rational thought as opposed to religious faith is also stressed in another document Kalka provided, an AHA statement entitled "What is Humanism?". The statement affirms humanism's focus on "reason and science" and repeatedly refers to humanism as a philosophy rather than a religion.

Other parts of Kalka's submission describe humanism as a religious movement. For instance, an excerpt from the AHA's Free Mind magazine discusses the Humanist Society of Friends ("HSOF"), a group whose motto is "a scientific religion for a scientific age." The article speaks of the "concept of Humanism as a non-theistic religion," stating that its view of humanism as a religion "allows for the opening of many doors and acquiring of many privileges that Humanism as a philosophy d[oes] not." Another AHA publication includes an advertisement advising readers of AHA sponsored humanist counselors who provide humanistic marriage and memorial services and have the legal status of minister in all fifty states.

Kalka also furnished his own statement attesting that humanism "is a study of ethics, and a religion for some in a personal way." Whether it was a religion for him, his statement did not say.[2]

From these sources, the Committee concluded that the needs and purposes of Kalka's proposed AHA group were "more philosophical and educational in nature." Additionally, one committee member spoke with an outside source associated with the

AHA who confirmed the Committee's determination that the group was more philosophically oriented. The Committee notified FCI–Jesup's warden of its conclusion, recommending that he not permit a chapter of the AHA to meet under the auspices of the Religious Services Department. It reasoned that the requirements of the group could be met outside of the Religious Services Department, a program which is reserved for groups that are "religious" in nature. Humanist literature should also be excluded from the chapel, the Committee decided, because only literature which is "religious" and connected to a recognized religious group is "distributed within the confines of the Religious Services Department."

The warden denied Kalka's request to allow AHA meetings as a chapel activity but informed him that he could establish a humanism group under the aegis of the prison's Education Department. On Kalka's administrative appeal, the BOP affirmed. Explaining its decision, a BOP administrator wrote that AHA's "own newsletters and literature ... consistently refer[ ] to Humanism as a 'philosophy' and not a 'religion.' " He added that in numerous requests for tax-exempt § 501(c)(3) status, the AHA has described itself as "an educational organization and not a religious organization." See 26 U.S.C. § 501(c)(3). The BOP official also mentioned the Supreme Court decision in Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680 (1961), commenting that the Court's reference to Secular Humanism as a religion applied only to a particular group of humanists known as the Fellowship of Humanity. Kalka was again told that his group was free to meet as part of the prison's Education Department.[3]

2. The AHA, an umbrella organization, includes the Humanist Society of Friends, a group which Kalka alleges has received tax-exempt status based on its religious purpose. See Complaint at 12. There is no indication, however, that Kalka is a member of the Humanist Society of Friends or that the AHA

chapter he intended to start would have been associated with that group.

3. Prior to the district court's decision, Kalka declined the offer to have AHA meetings in the Education Department. He later changed his mind. At the time the briefs were filed, Kalka had begun teaching a class on human-

In September 1997, Kalka brought this action against BOP Director Kathleen Hawk and other named and unnamed BOP officials, alleging that BOP's policy of excluding humanist groups from prison chapels violates the Free Exercise and Establishment Clauses of the First Amendment.[4] As a remedy, Kalka sought compensatory damages, a portion of which would be used to establish humanist groups in each of the nation's prisons.[5] He also sought an injunction compelling "prison officials so that Chapters of the American Humanism Association can be formed in all of the prisons" the BOP manages and an order "enjoining prison officials so that they will allow their chapels to include for dissemination to inmates literature that is not conventionally religious, or that might be viewed, in fact, as being anti-religious."[6]

The defendants moved to dismiss the claims, and the district court, treating the motion as one for summary judgment, ruled in their favor. *Kalka v. Hawk*, No. 97–2259 (D.D.C. Sept. 29, 1998). For purposes of resolving the motion, the court assumed that humanism, as professed and practiced by Kalka, was a religion. *See* mem. op. at 4. It concluded that BOP's denying him access to the prison chapel did not prevent Kalka from reasonably exercising his humanist beliefs. *See id.* at 6. Kalka failed to establish that BOP's offer to allow him to conduct services and distribute literature through the Education Department was unreasonable. *See id.* On the Establishment Clause claim, the court held that BOP's restrictions on Kalka's use of the chapel were reasonable, particularly because they did not prevent

him from freely exercising his humanist beliefs. *See id.* at 8. Such reasonable restrictions are necessary, the court said, to ensure the opportunity for all inmates freely to exercise their religion. *See id.* Having concluded that no constitutional violations occurred, the district court expressed no opinion on the qualified immunity defense of the BOP officials.

## II

### A

 Qualified immunity shields officials from liability for damages so long as their actions were objectively reasonable, as measured in light of the legal rules that were "clearly established" at the time of their actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C.Cir.1998). The immunity is not simply from damages but from having to participate in the proceedings. *See Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The Supreme Court has therefore instructed the lower courts that the validity of a qualified immunity defense should be determined as early as possible, preferably before discovery and trial. *See, e.g., Anderson v. Creighton*, 483 U.S. 635, 640 n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

 Both sides tell us we first must determine whether Kalka has alleged a constitutional violation, which depends on whether the "humanism" to which Kalka allegedly subscribes is a "religion" within the meaning of the First Amendment.

---

ism at FCI–Edgefield. *See* Brief Amicus Curiae of Court–Appointed Counsel in Support of Plaintiff–Appellant Ben Kalka at 12.

4. Though Kalka's complaint also alleged violations of the Fifth and Fourteenth Amendments, those claims were not presented in his briefs and were not decided by the district court.

5. Kalka framed his claim for damages as against the BOP not the individual defendants. Nonetheless, we will treat it as a *Bi-*

*vens* claim against the individuals in view of the facts that Kalka filed the action *pro se,* and that earlier in his complaint he cited *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

6. The injunctive claim is now moot in light of *Kalka's* release from federal custody on April 20, 2000. *See* Amicus 28(j) Letter filed May 9, 2000.

*Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), they say, precludes us from simply assuming *arguendo* that Kalka's humanism is a "religion," and then determining whether this was clearly established.

The critical passage in *Wilson* is as follows: "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Id.* at 609, 119 S.Ct. 1692 (quoting *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). The Court had suggested this order of decisionmaking in a footnote in *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), calling it the "better approach" because, if courts "always" ruled first on qualified immunity when no clearly established constitutional right existed, "standards of official conduct would remain uncertain." The Second Circuit treats *County of Sacramento,* and the two cases following it—*Conn* and *Wilson*—as not always requiring federal courts to dispose of the constitutional claim before upholding a qualified immunity defense. *See Horne v. Coughlin,* 191 F.3d 244 (2d Cir.1999); *Sound Aircraft Servs., Inc. v. Town of East Hampton,* 192 F.3d 329, 334 (2d Cir. 1999).[7] We agree with the Second Cir-

cuit's conclusion but not with all of its reasoning. It is, for instance, true that footnote five in *Sacramento* was "tentatively worded," *Horne,* 191 F.3d at 248, but there appears to be nothing tentative about the textual passage in *Conn,* quoted in *Wilson,* that the courts "must" initially decide if the plaintiff has alleged a constitutional right. On the other hand, the Supreme Court has itself warned against "dissect[ing] the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 341, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979).[8] So perhaps the statement about what the courts "must" do describes only what the courts ordinarily should do.

The Second Circuit also refused to treat the *Sacramento* procedure as mandatory because: "where there is qualified immunity, a court's assertion that a constitutional right exists would be pure dictum." *Horne,* 191 F.3d at 247. One wonders. A conclusion that a constitutional right exists would be dictum if and only if . it were unnecessary to the decision. But if the *Sacramento* line of cases requires the constitutional issue to be reached first, a lower court's resolution of that issue becomes a necessary part of its decision. The fact that the case theoretically could have been decided without deciding the constitutional

---

**7.** The Eleventh Circuit had reached the same conclusion, but did so before the Court decided *Wilson. See Santamorena v. Georgia Military College,* 147 F.3d 1337, 1343 (11th Cir. 1998). Judge Edmondson there expressed doubt whether footnote five in *Sacramento* represented a holding of the Court; he added that footnote five had not expressly invoked the Supreme Court's supervisory power over the lower courts. *See id.* at 1343 n.14. Since then, other panels of the Eleventh Circuit have treated the quoted language from *Wilson* as mandatory, as have other circuits. *See Jones v. Shields,* 207 F.3d 491, 494-95 (8th Cir. 2000); *Kitzman-Kelley v. Warner,* 203 F.3d 454, 457 (7th Cir.2000); *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000); *Hartley v. Parnell,* 193 F.3d 1263,

1270-71 (11th Cir.1999); *B.C. v. Plumas Unified Sch. Dist.,* 192 F.3d 1260, 1265-66 (9th Cir.1999); *Crosby v. Paulk,* 187 F.3d 1339, 1345 (11th Cir.1999).

**8.** *Horne* mentioned (191 F.3d at 248) that Justice Breyer, concurring in *Sacramento,* urged preservation of the lower courts' "flexibility, in appropriate cases, to decide § 1983 claims on the basis of qualified immunity, and thereby avoid wrestling with constitutional issues that are either difficult or poorly presented." 523 U.S. at 858-59, 118 S.Ct. 1708. The fact that Justice Breyer went on to join the majority opinions in both *Conn* and *Wilson* tends to indicate his belief that the opinions do not mandate a wholesale abandonment of this practice.

question is of no moment. "A court's stated and, on its view, necessary basis for deciding does not become dictum because a critic would have decided on another basis." Henry J. Friendly, *In Praise of Erie—And of the New Federal Common Law*, 39 N.Y.U. L. REV. 383, 386 (1964). As Professor Wright has written, if "the Court believes it is deliberately deciding a constitutional question, it is wise to suppose that the constitutional question has been decided, unless and until some later Court suggests a different answer." CHARLES ALAN WRIGHT, THE LAW OF FEDERAL COURTS § 56, at 385 (5th ed.1994). Consider *Wilson*. The Court held that police officers violate the Fourth Amendment when they bring reporters into the home while they are executing a search warrant, but that this constitutional right had not been clearly established and so the defendant officers were immune from liability in damages. The Supreme Court certainly did not think its conclusion regarding the Fourth Amendment was dictum. It framed its decision thus: "We *hold* that it is a violation of the Fourth Amendment...." 526 U.S. at 613, 119 S.Ct. 1692; *see also Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987).

█ The Second Circuit gave ·another reason for its reading of *Wilson* and *Conn.* Whenever the qualified immunity issue is reached—that is, whenever the constitutional issue is first decided against the official—"the government defendants will ... have no opportunity to appeal for review of the newly declared constitutional right in the higher courts." 191 F.3d at 247.[9] The severity of this problem may depend on how often plaintiffs in *Bivens*

cases fail to appeal adverse immunity rulings; when they do appeal, the winning officials can cross-appeal the ruling against them regarding the constitutionality of their actions. *See* Robert L. Stern, *When to Cross–Appeal or Cross–Petition—Certainty or Confusion?*, 87 HARV. L.REV. 763 (1974). Whatever the percentages, the Second Circuit's point is that the Supreme Court surely could not have wanted newly-devised constitutional rights to be recognized at the district court level without giving federal officials any chance for appellate review.

█ Several other considerations move us in the direction of the Second Circuit. If the *Sacramento* line of cases laid down a hard and fast rule that constitutional issues always have to be decided before the immunity defense is considered, we would have great difficulty squaring that rule with statements in three other Supreme Court decisions. *Mitchell v. Forsyth*, 472 U.S. at 528, 105 S.Ct. 2806, held that an "appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions...." In *United States v. Leon*, 468 U.S. 897, 924–25, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court recognized that in "cases addressing the question of good-faith immunity under 42 U.S.C.1983, ... courts have considerable discretion in conforming their

---

9. The courts of appeals have jurisdiction in civil cases over "all final decisions of the district courts." 28 U.S.C. § 1291. Normally, a party may not appeal from a favorable judgment. *See Forney v. Apfel*, 524 U.S. 266, 270, 118 S.Ct. 1984, 141 L.Ed.2d 269 (1998).
 With respect.to Supreme Court review, it is *not settled whether a prevailing party may petition for certiorari.* "The literal language of the [28 U.S.C.] § 1254(1) reference to 'any party' is broad enough to encompass the suc-

cessful or prevailing party before the court of appeals." ROBERT L. STERN ET AL, SUPREME COURT PRACTICE 45 (7th ed.1993). The Court has granted petitions filed by a winning party in the district court after the loser appealed to the court of appeals but before the court of appeals rendered judgment. *Id.* at 44. The Court has apparently never granted the certiorari petition of a party who prevailed in the appellate court. *Id.*

decisionmaking processes to the exigencies of particular cases." And in *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Court itself went directly to the immunity defense and sustained it without considering whether, as the court of appeals had held, the prisoner had a First Amendment right protecting his correspondence against official interference. These decisions flow from a long line of Supreme Court pronouncements counseling judicial restraint in constitutional decisionmaking, the most notable of which is *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Federal courts should not decide constitutional questions unless it is necessary to do so. *See Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 157–58, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984). *See also, e.g., Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); *Ashwander*, 297 U.S. at 347, 56 S.Ct. 466 (Brandeis, J., concurring). Before reaching a constitutional question, a federal court should therefore consider whether there is a nonconstitutional ground for deciding the case, and if there is, dispose of the case on that ground. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *Mobile v. Bolden*, 446 U.S. 55, 60 (1980); *Burton v. United States*, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905); *Ashwander*, 297 U.S. at 347, 56 S.Ct. 466 (Brandeis, J., concurring).

■ Furthermore, the Supreme Court's stated rationale for the *Sacramento* procedure does not pertain to all constitutional tort actions. The *Sacramento* footnote states: "if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain...." 523 U.S. at 841 n. 5, 118 S.Ct. 1708. This has little force when injunctive relief against the official's actions is potentially available, as it will be when an alleged constitutional violation is ongoing. While defendants to injunction actions may raise defenses that avoid the constitutional issue, they may not interpose the defense of qualified immunity. Although the injunctive portion of this case has become moot (*see supra* note 6), there is still the potential that other prisoners who practice humanism may bring such suits and settle the question whether humanism (of one form or another) is a religion within the First Amendment. This possibility of injunctive actions satisfies the Court's desire for "clarity in the legal standards for official conduct" (*Wilson*, 526 U.S. at 609, 119 S.Ct. 1692). It is another reason why deciding Kalka's case without reaching the constitutional issue does not contradict the reasoning of *Sacramento* or *Conn* and *Wilson*, none of which involved alleged ongoing violations of a particular individual's constitutional rights.

■ There is still another distinction between this case and *Sacramento, Conn* and *Wilson*, perhaps more important than the ones already mentioned. Whether Kalka's humanism is a religion under the First Amendment could not be decided in the abstract. Not only discovery but also a trial may be necessary to resolve the question. Yet the qualified immunity "entitlement is an *immunity from suit* rather than a mere defense to liability; ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. at 526, 105 S.Ct. 2806. In extending qualified immunity to public officers, the Court sought to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. The goal then is to relieve the "defendant who rightly claims qualified immunity [from] engag[ing] in expensive and time consuming preparation to defend the suit on its merits." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

It thus makes no sense to say that in order to determine whether one is entitled to immunity from trial we must first hold the trial. Yet that is what we would be saying if we proceeded directly to the question whether Kalka's form of humanism constituted a religion under the First Amendment. For this and the other reasons we have mentioned, we shall therefore assume *arguendo* that Kalka's humanism is a "religion," but as we next explain, the defendants are still entitled to qualified immunity.

### B

■ To repeat, qualified immunity shields these defendants from liability for civil damages if their actions were objectively reasonable, as measured in light of the legal rules that were "clearly established" at the time of their actions. *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. 2727; *Anderson v. Creighton*, 483 U.S. at 639, 107 S.Ct. 3034; *Farmer v. Moritsugu*, 163 F.3d at 613. And so we must ask whether the type of humanism to which Kalka allegedly subscribes, if a religion, was a clearly established "religion" within the First Amendment's meaning.

We may start by observing that traditional notions of religion surely would not include humanism. "[T]he term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will." *Davis v. Beason*, 133 U.S. 333, 342, 10 S.Ct. 299, 33 L.Ed. 637 (1890); *see* Note, *Toward a Constitutional Definition of Religion*, 91 Harv. L. Rev. 1056, 1065 n.60 (1978). But in a draft-exemption case during the Vietnam war, the Supreme Court interpreted the statutory language "in a relation to a Supreme Being" to include a belief "which occupies in the life of its possessor a place parallel to that filled by the God" of other traditional religions, but to exclude "essentially political, sociological, or philosophical views." *United States v. Seeger*, 380 U.S. 163, 165, 176, 85 S.Ct.

850, 13 L.Ed.2d 733 (1965). Justice Harlan joined the *Seeger* opinion with the "gravest misgivings," and later concluded that the Court's statutory construction had not been legitimate. *Welsh v. United States*, 398 U.S. 333, 345, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970). Whether *Seeger* meant to define "religion" as used in the First Amendment is doubtful. Instead of discussing the history of the First Amendment, the Court there discussed the history of the draft. Furthermore, the Court did not even cite the constitutional interpretation of religion expressed in *Torcaso v. Watkins*, 367 U.S. 488, 489–90, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); and it did not explain in what respect an individual's beliefs must be parallel to the beliefs of conventional religious faiths (in fervency of beliefs? in an overarching world vision? in explaining the meaning of life or our place in the universe? in believing in powers beyond the ken of science or pure reason?).

In *Torcaso*, the Court struck down a Maryland law requiring notaries to declare their belief in God as a condition to holding office. States may not, the Court said, "aid all religions against non-believers," or "aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." *Id.* at 495, 81 S.Ct. 1680. To this last statement, which signified that "religion" did not necessarily entail a belief in God, the Court attached a footnote:

> Among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and others. See *Washington Ethical Society* v. *District of Columbia*, 101 U.S.App.D.C. 371, 249 F.2d 127; *Fellowship of Humanity* v. *County of Alameda*, 153 Cal.App.2d 673, 315 P.2d 394; II Encyclopaedia of the Social Sciences 293; 4 Encyclopaedia Brittanica (1957 ed.) 325–327; 21 *id.*, at 797; Archer, Faiths Men Live By (2d ed. revised by Purinton), 120–138, 254–

313; 1961 World Almanac 695, 712; Year Book of American Churches for 1961, at 29, 47.

*Id.* at 495 n. 11. Buddhism and Taoism are well established Eastern religions. "The other two examples given by the Court refer to explicitly non-Theist organized groups, discussed in cases cited in the footnote, that were found to be religious for tax exemption purposes primarily because of their organizational similarity to traditional American church groups." *Malnak v. Yogi*, 592 F.2d 197, 206 (3d Cir.1979) (Adams, J., concurring). "Ethical Culture" referred to the beliefs of the Washington Ethical Society, an organization that held regular Sunday services with Bible reading, sermons, singing and meditation, and had "leaders" who preached and ministered to the group's members. *See Washington Ethical Soc'y v. District of Columbia*, 249 F.2d 127, 128 (D.C.Cir. 1957). The Society was held entitled to a tax exemption as a religious corporation even though its members were not required to believe in a Supreme Being or a supernatural power. *See id.* at 129. In *Fellowship of Humanity v. County of Alameda*, 153 Cal.App.2d 673, 674, 315 P.2d 394 (1957), the second case cited in *Torcaso*, an organization of Secular Humanists sought a tax exemption on the ground that they used their property "solely and exclusively for religious worship." Despite the group's non-theistic beliefs, the court determined that the activities of the Fellowship of Humanity, which included weekly Sunday meetings, were analogous to the activities of theistic churches and thus entitled to an exemption. *See id.* at 697, 315 P.2d 394.

The Court's statement in *Torcaso* does not stand for the proposition that humanism, no matter in what form and no matter how practiced, amounts to a religion under the First Amendment. The Court offered no test for determining what system of beliefs qualified as a "religion" under the First Amendment. The most one may read into the *Torcaso* footnote is the idea that a particular non-theistic group calling itself the "Fellowship of Humanity" qualified as a religious organization under California law. *See Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1537 (9th Cir.1985) (Canby, J., concurring) (quoting *Malnak*, 592 F.2d at 206, 212). *See also Alvarado v. City of San Jose*, 94 F.3d 1223, 1228 & n. 2 (9th Cir.1996) (citing cases supporting the limited scope of the *Torcaso* footnote); *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir.1994) ("[N]either the Supreme Court, nor this circuit, has ever held that evolutionism or secular humanism are 'religions' for Establishment Clause purposes.").

A reasonable prison official would not have believed that excluding Kalka's humanism from the prison's Religious Services Program was unlawful. *See Kimberlin v. Quinlan*, 199 F.3d 496, 503 (D.C.Cir. 1999). There was neither precedent declaring humanism in general to be a religion nor any prior ruling on the religious nature of Kalka's beliefs. Information considered by the Religious Issues Committee suggested that the American Humanism Association's precepts were rooted in philosophy not religion. *See supra* pp. 92–93. Given the judiciary's exceedingly vague guidance, in the face of a complex and novel question, the actions of the defendants therefore did not violate "clearly established" law.

*Affirmed.*

TATEL, Circuit Judge, concurring in part and concurring in the judgment:

I believe this court has discretion to avoid deciding whether Kalka has " 'alleged the deprivation of an actual constitutional right,' " *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)), for only one reason: this case is factually distinguishable from *Wilson*. As my colleagues observe, the constitutional question is one for which injunctive relief is potentially available, rendering inapplicable the Supreme Court's rationale for

departing from the principle that constitutional decisionmaking should be avoided where possible. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). The ongoing nature of the alleged violation and consequent potential for injunctive relief distinguish this case from every one in which the Supreme Court has used the *Wilson* procedure. *See Wilson*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (media representatives accompanied police officers executing arrest warrant in private home); *Conn*, 526 U.S. 286, 119 S.Ct. 1292, 143 L.Ed.2d 399 (prosecutor executed search warrant of attorney while client was testifying before grand jury); *Sacramento*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (motorcyclist killed during high-speed chase by police); and *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (government employee claimed that supervisor wrote defamatory letter). Accordingly, I agree with my colleagues that *Wilson* does not control here.

I am less persuaded by the three other reasons the court gives for not following *Wilson*. Agreeing with the Second Circuit, my colleagues first conclude that "the Supreme Court surely could not have wanted newly-devised constitutional rights to be recognized at the district court level without giving federal officials any chance for appellate review." Slip Op. at 96; *see also Horne v. Coughlin*, 191 F.3d 244, 247 (2d Cir.1999). But why not? District court decisions have no precedential effect. They "do not establish the law of the circuit . . ., nor, indeed, do they even establish 'the law of the district.'" *In re: Executive Office of the President*, 215 F.3d 20, 24 (D.C.Cir.2000) (quoting *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir.1991)). Government officials could hardly be injured by an inability to appeal rulings that have no legal force.

Of course, the fact that in some cases government officials might be unable to appeal could be a source of concern if

unreviewed district court decisions "clearly established" constitutional rights for purposes of qualified immunity analysis. In that event, government officials would have to tailor future conduct to conform with a district court's interpretation of the Constitution, or else risk personal liability should that interpretation later survive appellate review. But most of our sister circuits do not look to unreviewed district court decisions for clearly established rights. *See, e.g., Sound Aircraft Services, Inc. v. Town of East Hampton*, 192 F.3d 329, 337 (2d Cir.1999); *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 594 (10th Cir.1999); *Chandler v. James*, 180 F.3d 1254, 1276 (11th Cir.1999) (Tjoflat, J., concurring); *Jean v. Collins*, 155 F.3d 701, 709 (4th Cir.1998) (en banc). *But see Tribble v. Gardner*, 860 F.2d 321, 324 (9th Cir.1988) (looking to district court opinions for clearly established rights); *Hayes v. Long*, 72 F.3d 70, 73–74 (8th Cir.1995) (same). Although this circuit has never addressed the issue, I think it highly unlikely that we would ever hold that an unreviewed district court decision could clearly establish a constitutional right. *See In re: Executive Office of the President*, 215 F.3d at 23.

I also think the nonappealability concern is too sweeping to coexist with this court's statement that "courts ordinarily should" follow the *Wilson* procedure. Slip Op. at 10. That concern applies to all qualified immunity claims before district courts, for at the time of decision district judges have no way of knowing whether a plaintiff will appeal an adverse immunity ruling. But if it applies to all cases, it cannot be a reason for departing from the ordinary way of doing things.

Nor do I share the court's second concern: that "we would have great difficulty squaring [the *Wilson* procedure] with statements in three other Supreme Court decisions." Slip Op. at 11. To begin with, the most recent of those three cases was decided in 1985, *see Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d

411 (1985), yet twice in 1999 the Supreme Court stated that courts "must" reach the constitutional issue before deciding whether the right allegedly violated was clearly established, *see Wilson,* 526 U.S. at 609, 119 S.Ct. 1692; *Conn,* 526 U.S. at 290, 119 S.Ct. 1292, and four times in the 1990s the Supreme Court itself followed that procedure. *See Wilson,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818; *Conn,* 526 U.S. 286, 119 S.Ct. 1292, 143 L.Ed.2d 399; *Sacramento,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043; and *Siegert,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277. Surely it is these more recent cases that reflect the Supreme Court's current view.

In any event, we have no need to square the *Wilson* procedure with the earlier decisions, for the Supreme Court has already done so. As my colleagues observe, the earlier "decisions flow from a long line of Supreme Court pronouncements counseling judicial restraint in constitutional decisionmaking, the most notable of which is *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)." Slip Op. at 12. In *Sacramento,* however, the Supreme Court expressly held that the *Ashwander* principle did not apply to the constitutional tort claim at issue there:

> [T]he generally sound rule of avoiding determination of constitutional issues does not readily fit the situation here; when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity requires some determination about the state of constitutional law at the time the officer acted. What is more significant is that if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals.

*Sacramento,* 523 U.S. at 841 n. 5, 118 S.Ct. 1708.

With respect to the court's concern that the *Wilson* procedure might require discovery and trial to resolve constitutional questions, thereby depriving defendants of immunity from suit, *see* Slip Op. at 13, *Wilson* states that courts "must first determine whether the plaintiff has *alleged* the deprivation of an actual constitutional right at all...." 526 U.S. at 609, 119 S.Ct. 1692 (emphasis added). To me, this suggests that courts should begin by asking only whether a plaintiff's allegations, if true, make out a constitutional violation. *Siegert,* moreover, makes clear that the Court envisioned that the constitutional issues would be resolved as "purely legal" ones. 500 U.S. at 232, 111 S.Ct. 1789. Indeed, the primary reason *Siegert* gave for deciding the constitutional question is precisely the reason this court gives for avoiding it:

> A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all. Decision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits. One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit.

*Id.*

Finally, and most important, consideration of these last three reasons for not following *Wilson* is precluded by *Wilson* itself. The Supreme Court could not have spoken in more mandatory terms: "A court evaluating a claim of qualified immunity '*must* first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all.'" *Wil-*

*son,* 526 U.S. at 609, 119 S.Ct. 1692 (emphasis added) (quoting *Conn,* 526 U.S. at 290, 119 S.Ct. 1292). As the Supreme Court has also made clear, "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls...." *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Only because *Wilson* does not directly control on these facts do we have discretion to avoid determining whether Kalka has "alleged the deprivation of an actual constitutional right at all." *Wilson,* 526 U.S. at 609, 119 S.Ct. 1692.