United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 8, 2000 Decided December 12, 2000 

 No. 99-5307

 Jennifer K. Harbury, 
 Appellant

 v.

 John M. Deutch, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 96cv00438)

 Jodie L. Kelley argued the cause for appellant. With her 
on the briefs were Paul Hoffman, Beth Stephens and Jenni-
fer M. Green. Maureen F. Del Duca entered an appearance.

 R. Craig Lawrence, Assistant U.S. Attorney, argued the 
cause for appellees. With him on the brief was Wilma A. 
Lewis, U.S. Attorney.

 Before: Edwards, Chief Judge, Ginsburg and Tatel, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: Jennifer Harbury claims that for 
about one and a half years in the early 1990s, Central 
Intelligence Agency officials participated in the torture and 
murder of her husband, a Guatemalan citizen. She also 
claims that while he was being tortured and for more than a 
year and a half after his death, State Department and Nation-
al Security Council officials systematically concealed informa-
tion from her and misled her about her husband's fate. 
Seeking, among other things, damages under Bivens v. Six 
Unknown Named Agents of Fed. Bureau of Narcotics, 403 
U.S. 388 (1971), she filed suit in federal court, claiming 
deprivation of her husband's Fifth Amendment due process 
rights, violation of her right to familial association, and inter-
ference with her right of "access to courts." The district 
court dismissed these actions, finding that Harbury had failed 
to allege the deprivation of any actual constitutional rights, 
and that even if she had, defendants were entitled to qualified 
immunity. We agree with the district court as 
to Harbury's Fifth Amendment and familial association 
claims. But because we find that she has stated a valid claim 
for deprivation of her right of access to courts, and because 
the NSC and State Department officials are not entitled to 
qualified immunity on this claim. We reverse and remand for 
further proceedings.

 I

 Since this appeal comes here on a motion to dismiss, we 
accept the facts as alleged in the complaint. See Moore v. 
Valder, 65 F.3d 189, 192 (D.C. Cir. 1995). Emphasizing that 
defendants have not yet answered Harbury's charges and 
that her claims have been subject to neither discovery nor 
cross-examination, we set out the facts as she pleads them, 
borrowing liberally from her complaint.

 In 1991, Harbury, an American citizen, married Efrain 
Bamaca-Velasquez, a Guatemalan citizen and high-ranking 
member of the Guatemalan National Revolutionary Union, a 
Guatemalan rebel organization. Several months after their 

Texas wedding, Bamaca returned to Guatemala where, on or 
around March 12, 1992, he disappeared. The Guatemalan 
army reported that during a skirmish with its troops, Bamaca 
committed suicide and was buried nearby. This was false. 
In fact, Bamaca had been captured and secretly detained by 
members of the Guatemalan military, including, Harbury 
alleges, CIA "assets"--members of Guatemalan Security 
Forces or Intelligence Services paid by the CIA to obtain 
information about the Guatemalan resistance.

 According to the complaint, over the next twelve to eigh-
teen months, Bamaca's captors psychologically abused and 
physically tortured him. They chained and bound him naked 
to a bed, beat and threatened him, and encased him in a full-
body cast to prevent escape. Eventually, probably some time 
around September of 1993, they executed him.

 About a year after Bamaca disappeared, in early 1993, 
Harbury learned from a prisoner who had escaped from a 
Guatemalan interrogation camp that her husband was alive 
and being tortured. Harbury immediately contacted several 
State Department officials, reported what she had learned, 
and asked for information about her husband's status. Al-
though officials to whom she spoke promised to look into the 
matter, they never provided her with any information.

 In August 1993, Harbury obtained permission to open 
Bamaca's grave. Discovering that the body there was not 
his, she immediately informed Marilyn McAfee, the U.S. 
Ambassador to Guatemala. Although the Ambassador told 
Harbury that she would investigate the matter and report her 
findings, she too never provided Harbury with any informa-
tion.

 Over the next year, from October 1993 to October 1994, 
Harbury met repeatedly with State Department officials. 
Saying they were concerned about Bamaca's situation, these 
officials reassured her they were seriously looking into the 
matter and told her the Guatemalan Military had informed 
them that it did not have (and never had) custody of Bamaca.

 In October of 1994, the CBS news program 60 Minutes 
reported that the U.S. Embassy in Guatemala had an intelli-
gence report confirming that Bamaca had been captured 
alive. In response, the State Department publicly confirmed 
Bamaca's capture, stating that he had been lightly but not 
seriously wounded and held prisoner for some time. The 
State Department also reported that it had no information 
confirming that Bamaca was still alive.

 In the wake of the 60 Minutes report and the State 
Department's public statements, Harbury met with National 
Security Advisor Anthony Lake who told her that the govern-
ment had "scraped the bottom of the barrel" for information 
about her husband and that no further information existed. 
Complaint p 83. He promised that the government would not 
only continue searching for information, but also keep Har-
bury informed. Other State Department and NSC officials 
likewise told her that they had no concrete information about 
Bamaca's condition, but that they were continuing to assume 
that he was still alive. Suspecting that State and NSC 
officials were withholding information, Harbury filed a Free-
dom of Information Act request. Despite expedited process-
ing, she received no documents in the following months.

 Finally, because of the "failure of the [State Department 
and NSC] defendants to inform her of her husband's fate," 
Harbury announced that she would begin a hunger strike in 
front of the White House on March 12, 1995, the third 
anniversary of her husband's disappearance. Complaint p 87. 
State Department and NSC officials then met with her again, 
telling her this time that they believed Bamaca was dead 
because so many years had passed without evidence that he 
was alive. Unconvinced, Harbury began her hunger strike. 
Twelve days into the strike, Congressman Robert Torricelli 
announced publicly that years earlier, Bamaca had been killed 
at the order of a paid CIA asset.

 On her own behalf and as administratrix of Bamaca's 
estate, Harbury brought suit in the U.S. District Court here 
against various named and unnamed officials of the CIA, the 

State Department, and the NSC. She based her claims on 
two broad factual allegations. First, she alleged that CIA 
officials at all levels "knowingly engaged in, directed, collabo-
rated and conspired in, and otherwise contributed to [her 
husband's] secret imprisonment, torture and extrajudicial 
murder." Complaint p 49. Many of the Guatemalan military 
officers who tortured and killed Bamaca, she alleged, were 
paid CIA agents. Two had been trained in torture and 
interrogation techniques at the School of the Americas, a U.S. 
Army facility located in Georgia. According to Harbury, CIA 
officials who did not participate directly in Bamaca's torture 
not only paid Agency assets for information about Bamaca's 
rebel organization, knowing that the information had been 
extracted through torture, but also requested further intelli-
gence, knowing it too would be obtained in the same manner. 
And as a general matter, Harbury alleged that CIA officials 
knew of other gross human rights violations in Guatemalan 
interrogation centers--including beatings with cement blocks, 
burials of prisoners alive, and electrical shocks to the testicles 
and legs--and that CIA officials up the chain of command, 
from the operations and intelligence divisions to the Director 
himself, expressly authorized their assets to use torture to 
obtain information from Guatemalan rebel leaders.

 Second, Harbury alleged that while Bamaca was still alive, 
State Department and NSC officials, including Ambassador 
McAfee and NSA Lake, made "fraudulent statements and 
intentional omissions" that prevented her from "effectively 
seeking adequate legal redress, petitioning the appropriate 
government authorities, and seeking to publicize her hus-
band's true plight." Complaint p 98. According to the com-
plaint, when Harbury first contacted State Department offi-
cials to follow up on what she had learned from the escaped 
prisoner, they actually knew that her husband was alive and 
being tortured. They knew this, she alleged, because a week 
after Bamaca's capture, the CIA informed both State Depart-
ment and White House officials that Guatemalan military 
forces would "probably fabricate his combat death in order to 
maximize their ability to extract information from [him]." Id. 
at WW 35, 56-57. Yet State Department officials, including 

Ambassador McAfee, revealed none of this information to 
Harbury. Instead, they repeatedly reassured her that al-
though they were investigating Bamaca's fate, they had dis-
covered nothing. According to Harbury, internal memoranda 
distributed and received by both State Department and NSC 
officials demonstrate their "intent to keep the involvement of 
the U.S. Government in the detention, torture, and execution 
of Mr. Bamaca out of the public eye." Id. at p 69. Those 
officials, she alleged, "intentionally misled [Harbury], through 
their deceptive statements and omissions, into believing that 
concrete information about her husband's fate did not exist 
because they did not want to threaten their ability to obtain 
information from Mr. Bamaca," and because they feared that 
if they disclosed information to Harbury or anyone else, "they 
could then be subject to public embarrassment, censure, 
and/or legal liability." Id. at WW 67-69.

 After Bamaca's death, the pattern of deception and non-
disclosure allegedly continued. Although the Defense Intelli-
gence Agency reported in September 1993 to the State De-
partment, the White House, and the U.S. Embassy in Gua-
temala that Bamaca had been killed, all officials she met with 
during the following months, including NSA Lake, continued 
to lead her to believe not only that her husband was alive, but 
also that they were doing all they could to learn more about 
him. "[A]t no time," she alleged, did these officials inform 
her that "they were unwilling to investigate her case or to 
give her information about her husband's situation. Instead, 
a decision was made to neither share the information with 
her, nor inform her of the existence of such information." Id. 
at p 77.

 Based on these factual allegations, Harbury pleaded 28 
specific causes of action, including (1) claims against defen-
dants in their official capacities seeking a declaratory judg-
ment that their conduct was unconstitutional, as well as an 
injunction preventing the CIA from extracting information 
through torture and preventing the State Department and 
NSC from concealing information about CIA torture victims; 
(2) Bivens actions against defendants in their individual ca-
pacities seeking damages for their alleged constitutional viola-

tions; (3) common law tort claims against individual defen-
dants, including claims for intentional infliction of emotional 
distress and wrongful death; and (4) claims against individual 
defendants for violations of international law. Only Har-
bury's Bivens claims are directly at issue in this appeal. 
These claims rest on three alleged constitutional violations: 
(1) by contributing to Bamaca's torture, CIA defendants 
violated his Fifth Amendment substantive due process rights; 
(2) by participating in and concealing information about Ba-
maca's torture and murder, all defendants violated Harbury's 
constitutional right to familial association; and (3) by conceal-
ing information and misleading her about her husband's fate, 
NSC and State Department defendants violated her right of 
access to courts.

 The district court dismissed Harbury's Bivens claims, find-
ing with respect to each not only that she failed to allege a 
deprivation of an actual constitutional right, but also that 
even if she had, defendants were entitled to qualified immuni-
ty because the scope of the alleged right was not clearly 
established. Pursuant to Federal Rule of Civil Procedure 
54(b), the district court certified its dismissal of Harbury's 
Bivens claims as final. We review de novo a dismissal for 
failure to state a claim upon which relief can be granted, 
accepting the facts as alleged in the complaint. See Moore, 
65 F.3d at 192. "[A] complaint should not be dismissed for 
failure to state a claim unless it appears beyond doubt that 
the plaintiff can prove no set of facts in support of his claim 
which would entitle him to relief." Conley v. Gibson, 355 
U.S. 41, 45-46 (1957).

 II

 Harlow v. Fitzgerald holds that "government officials per-
forming discretionary functions, generally are shielded from 
liability for civil damages insofar as their conduct does not 
violate clearly established statutory or constitutional rights of 
which a reasonable person would have known." 457 U.S. 800, 
818 (1982). Following Harlow and abiding by the familiar 
practice of avoiding unnecessary adjudication of constitutional 

questions, many courts faced with claims resting on constitu-
tional rights of uncertain scope have dismissed cases based on 
qualified immunity alone. See, e.g., Childress v. Small Bus. 
Admin., 825 F.2d 1550, 1552 (11th Cir. 1987). In other 
words, "assum[ing], arguendo, without deciding" that a consti-
tutional right in fact exists, courts have asked whether the 
right is clearly established. See id.

 The Supreme Court cast doubt on this approach in Wilson 
v. Layne: "A court evaluating a claim of qualified immunity 
must first determine whether the plaintiff has alleged the 
deprivation of an actual constitutional right at all, and if so, 
proceed to determine whether that right was clearly estab-
lished at the time of the alleged violation." 526 U.S. 603, 609 
(1999) (internal quotation omitted). As the Court had previ-
ously recognized, "if the policy of avoidance [of unnecessary 
adjudication of constitutional issues] were always followed in 
favor of ruling on qualified immunity whenever there was no 
clearly settled constitutional rule of primary conduct, stan-
dards of official conduct would tend to remain uncertain, to 
the detriment both of officials and individuals." County of 
Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).

 Notwithstanding Wilson, the Government urges us to dis-
pose of this case based on qualified immunity without reach-
ing the merits of Harbury's underlying claims. In support of 
this argument, it cites our recent decision in Kalka v. Hawk, 
215 F.3d 90 (D.C. Cir. 2000), where the district court had 
dismissed a complaint brought by a federal prisoner claiming 
that the Bureau of Prisons had denied him his First Amend-
ment right to practice secular humanism. Without reaching 
the merits of Kalka's constitutional claim, we affirmed based 
on qualified immunity alone. The Supreme Court's concern 
that the scope of the underlying constitutional right would 
never be adjudicated, we held, had "little force when injunc-
tive relief against the official's actions is potentially available." 
Id. at 97. Although Kalka's own claim for injunctive relief 
had become moot (he had been released from prison during 
his appeal), "there is still the potential that other prisoners 
who practice humanism may bring such suits and settle the 
question whether humanism ... is a religion within the First 

Amendment. This possibility of injunctive actions satisfies 
the Court's desire for 'clarity in the legal standards for official 
conduct.' " Id. (quoting Wilson, 526 U.S. at 609).

 In certain respects, this case does resemble Kalka. Like 
Kalka, Harbury alleges that the challenged government con-
duct is ongoing: in a part of her suit not before us, Harbury 
claims that the government still extracts information through 
torture and covers up information about the victims. Also 
like Kalka, Harbury herself is no longer subject to the 
challenged conduct: Bamaca's torture ended with his death, 
and sufficient facts about U.S. involvement in his treatment 
have come to light to enable Harbury to seek legal relief.

 At this point, however, the similarities with Kalka end. 
Harbury has been able to challenge the conduct of the 
government only because its cover-up failed. If the cover-up 
had succeeded, Harbury would have learned neither of CIA 
involvement in her husband's torture nor of NSC and State 
Department attempts to keep that involvement secret. Thus, 
unlike in Kalka, where future secular humanist prisoners 
could seek injunctive relief for denial of First Amendment 
rights (so long as they remained incarcerated), the very 
nature of the conduct Harbury challenges renders unlikely 
the possibility of injunctive relief: another spouse in Har-
bury's position could challenge her husband's torture only if 
she learned of the torture before it ended. In essence, the 
Government asks us to defer adjudication of the constitution-
ality of its alleged conduct until it again fails in a cover-up, 
this time before the victim dies. Nothing in Kalka requires 
such a preposterous result.

 Applying Wilson, then, we must address the validity of 
Harbury's constitutional allegations before reaching the ques-
tion of qualified immunity. It is to that task that we now 
turn.

 Fifth Amendment

 Government conduct that "shocks the conscience" violates 
the Fifth Amendment guarantee against deprivation of "life, 
liberty, or property, without due process of law." See Rochin 

v. California, 342 U.S. 165, 172-73 (1952). No one doubts 
that under Supreme Court precedent, interrogation by tor-
ture like that alleged by Harbury shocks the conscience. See 
id. at 172 (interrogation methods were "too close to the rack 
and the screw to permit of constitutional differentiation"); 
Palko v. Connecticut, 302 U.S. 319, 326 (1937), overruled on 
other grounds by Benton v. Maryland, 395 U.S. 784 (1969) 
(noting that the Due Process Clause must at least "give 
protection against torture, physical or mental"). The difficult 
question, and the one presented by this case, is whether the 
Fifth Amendment prohibits torture of non-resident foreign 
nationals living abroad. Before reaching that question, how-
ever, we must consider Harbury's claim that because many of 
the CIA, NSC, and State Department officials who she says 
conspired to torture her husband did so within the United 
States, this case does not require extra-territorial application 
of the Fifth Amendment.

 In support of this argument, Harbury cites Cardenas v. 
Smith, 733 F.2d 909 (D.C. Cir. 1984), which involved a 
Colombian citizen whose Swiss bank accounts were seized by 
Swiss authorities at the request of the U.S. Department of 
Justice. Despite the fact that the seized accounts were 
located in Switzerland, we suggested in dicta that the plaintiff 
might be able to establish injury within the U.S. by showing 
that her accounts were seized as a result of an unlawful 
conspiracy within the Justice Department. Id. at 913. Har-
bury also cites Lamont v. Woods, 948 F.2d 825 (2d Cir. 1991), 
which involved allegations that the U.S. Government violated 
the Establishment Clause of the First Amendment by giving 
grants to foreign religious schools. Even though the money 
was delivered and spent abroad, the court held that the 
alleged violation of the Establishment Clause was domestic 
because it occurred when the federal agency allocated the 
funds. Id. at 834.

 Harbury fails to notice the relevance of United States v. 
Verdugo-Urquidez, 494 U.S. 259 (1990), a case she cites later 
in her brief, where the Supreme Court held that a warrant-
less search and seizure of an alien's property in Mexico did 
not violate the Fourth Amendment. The search was con-

ceived, planned, and ordered in the United States, carried out 
in part by agents of the United States Drug Enforcement 
Agency, and conducted for the express purpose of obtaining 
evidence for use in a United States trial. See id. at 262-63. 
Still, the Court treated the alleged violation as having "oc-
curred solely in Mexico." Id. at 264. In reaching this 
conclusion, the Court never mentioned that the search was 
both planned and ordered from within the United States. 
Instead, it focused on the location of the primary constitution-
ally significant conduct at issue: the search and seizure itself.

 We think Verdugo controls this case. Like the warrantless 
search there, the primary constitutionally relevant conduct at 
issue here--Bamaca's torture--occurred outside the United 
States. The same was not true in Lamont. And Cardenas, 
on which Harbury also relies, was decided prior to Verdugo. 
We thus turn to Harbury's primary claim--that Bamaca was 
entitled to Fifth Amendment protection even though the 
torture occurred in Guatamala.

 Acknowledging that aliens are entitled to fewer constitu-
tional protections than citizens, see Matthew v. Diaz, 426 U.S. 
67, 77-79 (1976), and that constitutional protections (even for 
citizens) diminish outside the U.S., see Verdugo, 494 U.S. at 
270, Harbury argues that the Constitution's most fundamen-
tal protections, like the Fifth Amendment prohibition of tor-
ture, apply even to foreign nationals located abroad. In 
support of this claim, she cites three lines of cases holding 
that non-citizens outside the United States enjoy constitution-
al rights. First, courts have held that inhabitants of non-
state territories controlled by the U.S.--such as unincorporat-
ed territories or occupation zones after war--are entitled to 
certain "fundamental" constitutional rights. See Examining 
Bd. of Eng'rs., Architects & Surveyors v. Otero, 426 U.S. 572, 
599 n.30 (1976); Balzac v. Porto Rico, 258 U.S. 298, 312-13 
(1922); United States v. Tiede, 86 F.R.D. 227, 242-44 (U.S. 
Ct. Berlin 1979). Courts have also held that excludable 
aliens--aliens apprehended outside the U.S. while attempting 
to cross the border and held within the U.S. pending trial--
likewise enjoy basic due process rights against gross physical 
abuse. See Amanullah v. Nelson, 811 F.2d 1, 9 (1st Cir. 

1987); Lynch v. Cannatella, 810 F.2d 1363, 1374 (5th Cir. 
1987). Finally, courts have suggested that non-resident 
aliens abducted by the government for trial within the United 
States have basic due process rights. See United States v. 
Toscanino, 500 F.2d 267 (2d Cir. 1974); see also United 
States v. Lambros, 65 F.3d 698, 701 (8th Cir. 1995).

 Although these cases demonstrate that aliens abroad may 
be entitled to certain constitutional protections against mis-
treatment by the U.S. Government, we do not agree that they 
establish that Bamaca's torture ran afoul of the Fifth Amend-
ment. To begin with, in adjudicating the application of 
constitutional rights to aliens, the Supreme Court has 
looked--among other factors--to whether the aliens have 
"come within the territory of the United States and developed 
substantial connections with this country." See Verdugo, 494 
U.S. at 271. In all three sets of cases Harbury cites, the 
aliens had a substantially greater connection to the U.S. than 
Bamaca. The excludable alien cases involved persons physi-
cally present in the U.S. The occupation zone cases involved 
foreign nationals under de facto U.S. political control. And 
although the alien in Toscanino had been tortured in a 
foreign country, he was abducted to and tried in the United 
States. In fact, the Second Circuit, treating the torture and 
abduction as part of the pre-trial process, focused on the fact 
that allowing the government to seize and torture defendants 
before bringing them to trial would threaten the integrity of 
the United States judicial process. See Toscanino, 500 F.2d 
at 275-79. In contrast to the aliens involved in these cases, 
Bamaca was not physically present in the United States, not 
tortured in a country in which the United States exercised de 
facto political control, and not abducted for trial in a United 
States court.

 Even if the cases Harbury cites were not so easily distin-
guishable, this issue would also be controlled by Verdugo. 
Though that case involved extraterritorial application of the 
Fourth Amendment, the Court also dealt with the extraterri-
torial application of the Fifth:

 Indeed, we have rejected the claim that aliens are enti-
 tled to Fifth Amendment rights outside the sovereign 
 territory of the United States. In Johnson v. Eisentrag-
 er ... the Court held that enemy aliens arrested in 
 China and imprisoned in Germany after World War II 
 could not obtain writs of habeas corpus in our federal 
 courts on the ground that their convictions for war 
 crimes had violated the Fifth Amendment.... The Ei-
 sentrager opinion acknowledged that in some cases con-
 stitutional provisions extend beyond the citizenry; "the 
 alien ... has been accorded a generous and ascending 
 scale of rights as he increases his identity with our 
 society." But our rejection of the extraterritorial appli-
 cation of the Fifth Amendment was emphatic:
 
 "Such extraterritorial application of organic law would 
 have been so significant an innovation in the practice 
 of governments that, if intended or apprehended, it 
 could scarcely have failed to excite contemporary com-
 ment. Not one word can be cited. No decision of this 
 Court supports such a view.... None of the learned 
 commentators on our Constitution has even hinted at 
 it. The practice of every modern government is op-
 posed to it."
 
Id. at 269 (quoting Johnson v. Eisentrager, 339 U.S. 763, 770, 
784-85 (1950)). To be sure, as Harbury points out, this 
language is dicta. But it is firm and considered dicta that 
binds this court. See, e.g., United States v. Oakar, 111 F.3d 
146, 153 (D.C. Cir. 1997) ("[c]arefully considered language of 
the Supreme Court, even if technically dictum, generally must 
be treated as authoritative") (internal quotation omitted). 
Harbury also correctly observes that Eisentrager--the case 
relied on by Verdugo--concerned rights of enemy aliens 
during wartime. But the Supreme Court's extended and 
approving citation of Eisentrager suggests that its conclu-
sions regarding extraterritorial application of the Fifth 
Amendment are not so limited. For these reasons, we agree 
with the district court that Harbury failed to allege a valid 
claim for deprivation of her husband's Fifth Amendment due 
process rights.

 Familial Association

 The Constitution protects familial relationships from un-
warranted government interference in at least two circum-
stances. First, parents have a right to maintain their rela-
tionship with their children. See, e.g., Santosky v. Kramer, 
455 U.S. 745 (1982) (holding that a state must support allega-
tions of parental neglect with at least clear and convincing 
evidence before terminating the rights of parents in their 
natural child); Stanley v. Illinois, 405 U.S. 645 (1972) (strik-
ing down a law automatically making children of unwed 
fathers wards of the State upon the death of their mother). 
Second, family members have a constitutional right to make 
certain private decisions regarding family affairs, such as 
whether to procreate, see Roe v. Wade, 410 U.S. 113 (1972) 
(abortion), Griswold v. Connecticut, 381 U.S. 479 (1965) (con-
traception), or whether to send children to public school, see 
Pierce v. Soc'y of Sisters, 268 U.S. 510 (1925). Harbury's 
claims rest on both categories of rights.

 Relying on the first category, Harbury argues that by 
murdering Bamaca, CIA defendants unconstitutionally de-
prived her of her right to continuing association with her 
husband. The district court dismissed this claim because 
Harbury failed to allege that the defendants murdered Bama-
ca for the purpose of ending her marriage. Urging us to 
reverse, Harbury argues that the district court's purpose 
requirement conflicts with Supreme Court cases finding due 
process violations in circumstances involving far less serious 
interference with familial relationships--such as laws requir-
ing children to attend public schools--and no direct purpose-
ful interference with the family. To be sure, these cases 
involve the second category of rights--the right to make 
private familial decisions--but Harbury argues that there is 
no principled reason to impose a purpose requirement in the 
first category and not the second. Harbury also argues that 
since officials will likely never kill anyone for the purpose of 
terminating a marriage, a purpose requirement effectively 

eviscerates familial association claims based on wrongful kill-
ings.

 Our sister circuits have split on whether familial association 
claims require allegations of purposeful interference. Some 
circuits have held that the Due Process Clause only protects 
against direct, intentional interference with familial relation-
ships. In Ortiz v. Burgos, for example, the First Circuit held 
that the stepfather and siblings of a prisoner beaten to death 
by guards had no independent cause of action for loss of 
familial association because the beating was not specifically 
intended to deprive them of their association with the dece-
dent. See 807 F.2d 6, 8 (1st Cir. 1986); see also Shaw v. 
Stroud, 13 F.3d 791, 804-05 (4th Cir. 1994); Harpole v. 
Arkansas Dep't of Human Servs., 820 F.2d 923, 927-28 (8th 
Cir. 1987); Trujillo v. Bd. of County Comm'rs., 768 F.2d 
1186, 1189-90 (10th Cir. 1985). But other circuits have held 
in cases of wrongful killings of children that the surviving 
parent had an independent due process claim, even though 
the killing was not specifically intended to disrupt the parent-
child relationship. In one such case, Bell v. City of Milwau-
kee, the Seventh Circuit held that the father (but not the 
siblings) of a decedent wrongfully killed by the police had a 
constitutional claim for loss of association with his son even 
though the killing was motivated by racism, not intent to 
deprive him of his son's companionship. See 746 F.2d 1205, 
1242-48 (7th Cir. 1984); see also Smith v. City of Fontana, 
818 F.2d 1411, 1417-20 (9th Cir. 1987); Estate of Bailey v. 
County of York, 768 F.2d 503, 509 n.7 (3d Cir. 1985).

 In considering Harbury's claim, we are mindful of the 
caution we must exercise in expanding the liberty interests 
protected by substantive due process. "As a general matter," 
the Supreme Court said in Collins v. Harker Heights, "[we 
have] always been reluctant to expand the concept of substan-
tive due process because guideposts for responsible decision-
making in this unchartered area are scarce and open-ended. 
The doctrine of judicial self-restraint requires us to exercise 
the utmost care whenever we are asked to break new ground 
in this field." 503 U.S. 115, 125 (1992) (citation omitted).

 Bearing this caution in mind, as well as the obvious propo-
sition that it operates with even greater force on the lower 
federal courts, we think that two features of Supreme Court 
precedent bar us from accepting Harbury's claim. First, 
although the Court has never directly addressed the issue in 
the context of a wrongful killing, it has found a constitutional 
right to continuing association with family members only in 
cases involving direct, purposeful interference with familial 
relationships. See, e.g., Stanley, 405 U.S. 645; Santosky, 455 
U.S. 745. As the First Circuit observed, the Court has 
"never held that governmental action that affects the parental 
relationship only incidentally ... is susceptible to challenge 
for a violation of due process." Ortiz, 807 F.2d at 8. Equally 
significant, the Supreme Court has recognized a right to 
continuing familial association only in cases involving parent-
child relationships. In doing so, the Court has emphasized 
the importance of the parent-child bond. See, e.g., Stanley, 
405 U.S. at 651 (noting that the Court had previously deemed 
the rights to conceive and raise one's children as "essential," 
"basic," and "far more precious ... than property rights"); 
Santosky, 455 U.S. at 753 (referring to the "fundamental 
liberty interest of natural parents in the care, custody, and 
management of their child," and to parents' "vital interest in 
preventing the irretrievable destruction of their family life"). 
Even circuit court cases that have expanded the right to 
include indirect deprivations of association involve only par-
ent-child relationships, see Bell, 746 F.2d at 1242-48; Smith, 
818 F.2d at 1417-20; Estate of Bailey, 768 F.2d at 509 n.7. 
And in one such case, Bell, the court expressly declined to 
broaden the right to include the decedent's surviving siblings. 
See 746 F.2d at 1245-48.

 Harbury's claim thus lies beyond Supreme Court precedent 
in not one but two respects: it concerns neither a parent-child 
relationship nor purposeful interference with a familial rela-
tionship. On the facts of this case, therefore, we need not 
decide whether the constitutional right to continuing familial 
association requires allegations of purpose to interfere with 
the right, nor whether the constitutional right to familial 
association extends to the marriage relationship. We hold 

only that in view of Supreme Court precedent and in light of 
the Court's admonition in Collins, we cannot extend a consti-
tutional right to familial association to cases where, as here, 
the government has indirectly interfered with a spousal rela-
tionship. The First Circuit, declining to extend due process 
protection to incidental deprivations of familial association, 
used language we think particularly compelling:

 Although we recognize and deplore the egregious nature 
 of the alleged government action in this case, we hesitate, 
 in the rather novel context of this case, to erect a new 
 substantive right upon the rare and relatively uncharted 
 terrain of substantive due process when case law, logic 
 and equity do not command us to do so. It does not 
 necessarily follow that the incidental deprivation of even 
 a natural parent's parental rights is actionable simply 
 because the relevant deprivation of life is shocking. In 
 addition, a conclusion that governmentally caused termi-
 nation of, or encroachment on, the parental interest in 
 the continued relationship with a child always is action-
 able would constitutionalize adjudication in a myriad of 
 situations we think inappropriate for due process scruti-
 ny, including the alleged wrongful prosecution and incar-
 ceration of a child or the alleged wrongful discharge of a 
 child from a state job, forcing the child to seek employ-
 ment in another part of the country. Moreover, the 
 problem of giving definition and limits to a liberty inter-
 est in this vast area seems not only exceedingly difficult 
 but to a considerable extent duplicative of the wide-
 spread existence of state causes of action, as in this case, 
 which provide some compensation to grieving relatives.
 
Ortiz, 807 F.2d at 9. Emphasizing that it sought "neither to 
minimize the loss of a family member nor to denigrate the 
fundamental liberty interest in matters of family life that has 
long been a part of our constitutional fabric," the First Circuit 
concluded: "even an interest of great importance may not 
always be entitled to constitutional protection.... Our con-
clusion is simply that, in light of the limited nature of the 
Supreme Court precedent in this area, it would be inappropri-

ate to extend recognition of an individual's liberty interest in 
his or her family or parental relationship to the facts of this 
case." Id. at 9-10 (citations omitted). For essentially similar 
reasons, we are doubly reluctant to make the even broader 
expansion of the right to familial association sought by Har-
bury.

 Harbury's second familial association claim, this one 
brought against State Department and NSC defendants, 
charges that their failure to disclose information about Bama-
ca violated her right to make intimate personal decisions 
about her marriage. To support this claim, she cites Planned 
Parenthood v. Casey, where the Supreme Court stated that 
decisions within the "private realm of family life" are among 
"the most intimate and personal choices a person may make 
in a lifetime," and are "central to the liberty protected by the 
Fourteenth Amendment." 505 U.S. 833, 851 (1992). Relying 
on this broad language, Harbury asserts that she had a due 
process right to decide how best to save her husband from 
torture and to retrieve his remains and bury him after he 
died. Defendants, she urges, prevented her from making 
these decisions by concealing information about his torture 
and death.

 We agree with the district court that Harbury's claim lacks 
foundation in constitutional jurisprudence. The broad gener-
al principle Harbury cites appears never to have been applied 
to a situation even remotely like hers. Nor does she explain 
why it should be. We therefore decline to extend the right in 
the manner she proposes.

 III

 This brings us to our only area of disagreement with the 
district court: Harbury's access to courts claim. "[T]he right 
to sue and defend in the courts," the Supreme Court long ago 
said, "is the alternative of force. In an organized society it is 
the right conservative of all other rights, and lies at the 
foundation of orderly government. It is one of the highest 
and most essential privileges of citizenship." Chambers v. 
Baltimore & Ohio R.R., 207 U.S. 142, 148 (1907). The right 

not only protects the ability to get into court, see, e.g., Ex 
parte Hull, 312 U.S. 546 (1941) (striking down a prison 
regulation prohibiting prisoners from filing petitions for habe-
as corpus unless they are found "properly drawn" by a state 
official), but also ensures that such access be "adequate, 
effective, and meaningful." Bounds v. Smith, 430 U.S. 817, 
822 (1977).

 Applying this standard, several of our sister circuits have 
found that government cover-ups can infringe the right of 
access to courts. In Bell, 746 F.2d 1205, for example, city 
police officers planted evidence and contrived a false story to 
make their killing of an unarmed man whom they shot in the 
back seem an act of self-defense. The victim's father filed a 
wrongful death action against both the officer and the city, 
but the case settled for an amount so small that the father 
never cashed the check. When the true facts of the killing 
emerged twenty years later, the victim's survivors sued the 
police, alleging that the conspiracy to conceal the facts had 
interfered with their ability to seek legal redress. Sustaining 
a jury verdict for plaintiffs, the Seventh Circuit found that 
"[t]hough [Bell's father] filed a wrongful death claim in state 
court soon after the killing, the cover-up and resistance of the 
investigating police officers rendered hollow his right to seek 
redress...." Id. at 1261.

 The Fifth Circuit reached a similar result in Ryland v. 
Shapiro, 708 F.2d 967 (5th Cir. 1983), recognizing a potential 
denial of the right of access when an alleged cover-up delayed 
release of the facts of a murder for eleven months. Noting 
that "[d]elay haunts the administration of justice," the court 
held that the victim's parents could state a denial of access 
claim since "[t]he defendants' actions could have prejudiced 
[their] chances of recovery in state court because the result-
ing delay would cause stale evidence and the fading of 
material facts in the minds of potential witnesses." Id. at 
974, 975; see also Swekel v. City of River Rouge, 119 F.3d 
1259, 1263-64 (6th Cir. 1997) (plaintiff must "[show] that the 
defendants' actions foreclosed her from filing suit in state 
court or rendered ineffective any state court remedy she 
previously may have had"); Delew v. Wagner, 143 F.3d 1219, 

1222 (9th Cir. 1998) (same); Vasquez v. Hernandez, 60 F.3d 
325, 329 (7th Cir. 1995) (plaintiffs must allege either that they 
have "been prevented from pursuing a tort action in state 
court or that the value of such an action has been reduced by 
the cover-up"); cf. Barrett v. United States, 798 F.2d 565, 575 
(2d Cir. 1986) ("Unconstitutional deprivation of a cause of 
action occurs when government officials thwart vindication of 
a claim by violating basic principles that enable civil claimants 
to assert their rights effectively.").

 Citing Bell, Ryland, and other similar cases, Harbury 
argues that NSC and State Department defendants, by giving 
her "false and deceptive information related to her husband 
and otherwise concealing whether he was alive, ... deprived 
Plaintiff of her right ... to adequate, effective, and meaning-
ful access to the courts." See Complaint p 174. The Govern-
ment responds that Harbury "failed to identify a ... constitu-
tional right to have federal officials report on what they knew 
about a foreign revolutionary leader captured by a foreign 
government on the field of battle." See Appellee's Br. at 14. 
According to the Government, this failure distinguishes Har-
bury's case from Bell and other cases where police officers 
charged with investigating a crime destroy, conceal, or manu-
facture evidence in violation of statutory duties.

 We think the Government misreads Harbury's complaint. 
She never alleges that defendants breached a duty to disclose 
information to her. Rather, she alleges that they affirmative-
ly deceived her into believing that they were actively seeking 
information about her husband. Instead of saying (as they 
could have) that they were unable to discuss Bamaca's situa-
tion, they sought to lull her into believing that they were 
working on her behalf, intending to prevent her from suspect-
ing that the U.S. Government was actually involved in Bama-
ca's torture. One of their express objectives, Harbury alleg-
es, was to prevent her from suing them. Viewed this way, 
and regardless of whether Defense and NSC officials had an 
affirmative duty to provide information to Harbury in the 
first place, the complaint states a clear case of denial of 
access to courts. Cf. Barrett, 798 F.2d 565 at 575 (though 
defendant government officials "were not under any duty to 

volunteer to the estate information that would alert it to the 
existence of a claim against the federal government and 
certain of its officials ... government officials were not free 
to arbitrarily interfere with the estate's vindication of its 
claims").

 The district court, though agreeing that Harbury might be 
able to base an access to courts claim on the alleged cover-up, 
nevertheless dismissed her claim because she had not yet 
finished prosecuting the tort claims also pleaded in her 
complaint. In reaching this conclusion, the district court 
relied on Swekel, where the Sixth Circuit rejected an access 
to courts claim because the plaintiff had not yet filed suit in 
state court: "Before filing an 'access to courts' claim, a 
plaintiff must make some attempt to gain access to the courts; 
otherwise, how is this court to assess whether such access 
was in fact 'effective' and 'meaningful'?" 119 F.3d at 1264. 
The district court also cited Delew, 143 F.3d 1219, where the 
Ninth Circuit dismissed an access to courts claim even though 
the plaintiff, unlike the plaintiff in Swekel, had actually filed a 
wrongful death action based on the same set of facts. Stating 
that "because the [plaintiffs'] wrongful death action remains 
pending in state court, it is impossible to determine" whether 
"the defendants' cover-up violated [the plaintiffs'] right of 
access to the courts by rendering 'any available state court 
remedy ineffective,' " the court gave plaintiffs leave to re-file 
"if in fact the defendants' alleged cover-up actually rendered 
all state court remedies ineffective." Id. at 1222-23.

 In some ways this case does resemble Swekel and Delew. 
Like plaintiffs in those cases, Harbury alleges that due to the 
cover-up, "key witnesses ... may now be dead or missing ... 
crucial evidence may have been destroyed, and ... memories 
may have faded." Harbury v. Deutch, No. 
96-00438 (D.D.C. filed Mar. 23, 1999) at 18. If her complaint 
rested solely on such allegations, we might agree with the 
district court. But Harbury's complaint goes further: not 
limited to wrongful death and intentional infliction of emotion-
al injury, it alleges that but for the cover-up, she might have 
been able to save her husband's life. "As a result of the 
fraudulent statements and intentional omissions made by the 

Department of State and the [NSC] defendants ... Plaintiff 
was unable to take appropriate actions to save her husband's 
life. Specifically, Plaintiff was foreclosed from effectively 
seeking adequate legal redress, petitioning the appropriate 
government authorities, and seeking to publicize her hus-
band's true plight through the media." Complaint p 98. Am-
plifying this point at oral argument, Harbury's counsel ex-
plained that if defendants had disclosed the information they 
possessed about Bamaca, Harbury could have sought an 
emergency injunction based on an underlying tort claim for 
intentional infliction of emotional distress. Even if the NSC 
and State Department officials had simply said they could not 
discuss Bamaca's situation, counsel explained, Harbury would 
have filed her FOIA requests immediately, thus perhaps 
obtaining the information necessary to seek an injunction in 
time to save her husband's life. Instead, believing defen-
dants' reassurances, Harbury waited for the State Depart-
ment and NSC officials to complete their "investigation."

 If Harbury's allegations are true, then defendants' reassur-
ances and deceptive statements effectively prevented her 
from seeking emergency injunctive relief in time to save her 
husband's life. Because his death completely foreclosed this 
avenue of relief, nothing would be gained by requiring Har-
bury to postpone this aspect of her access to courts cause of 
action until she finishes prosecuting her tort claims.

 The Government offers another reason for affirming the 
district court. Relying on Swekel, it argues that since Har-
bury "always had the option to file suit with or without 
information from any defendant," her claim should be dis-
missed based on her failure to file such a suit. See Appellee's 
Br. at 15 n.5 and accompanying text. But again, Swekel is 
very different from this case. There, police allegedly con-
cealed the identity of a potential defendant involved in a fatal 
accident until after the statute of limitations had run. When 
the victim's spouse filed a deprivation of access to courts 
claim, the Sixth Circuit dismissed, observing that "[no] evi-
dence ... establishes that [plaintiff] even attempted to go to 
the state court in the first instance." Swekel, 119 F.3d at 
1264. The trial court, moreover, had found that the plaintiff 

had been aware of all essential facts of the accident except 
the defendant's identity, and thus could have filed a "John 
Doe" suit despite the cover-up. See id. at 1261. Harbury, in 
contrast, asserts that she "had no idea that the United States 
Government was aware of, much less involved in, her hus-
band's detention and torture." Thus "unaware that there was 
a potential claim of any kind against any U.S. officials," 
Harbury had "no reason to believe that she could state a 
claim in United States courts." Appellant's Reply Br. at 14. 
Unlike in Swekel, therefore, not only did defendants allegedly 
deprive Harbury of any opportunity to seek relief in the 
courts, but they effectively concealed most of the "essential 
facts" of the case, including U.S. Government involvement, 
until after emergency injunctive relief would have been futile. 
Cf. Swekel, 119 F.3d at 1264 n.2 (recognizing that plaintiff 
need not file a prior suit if "it would be completely futile for a 
plaintiff to attempt to access the state court system").

 Concluding that Harbury has pleaded an access to courts 
claim, however, does not end our task, for the district court 
also found that even if Harbury could bring such a claim, 
defendants would be entitled to qualified immunity. For 
purposes of qualified immunity, it is not enough for a plaintiff 
to allege that a defendant's conduct violated a right that is 
clearly established in general terms. Instead, "the right the 
official is alleged to have violated must have been 'clearly 
established' in a more particularized ... sense: The contours 
of the right must be sufficiently clear that a reasonable 
official would understand that what he is doing violates that 
right. This is not to say that an official action is protected by 
qualified immunity unless the very action in question has 
previously been held unlawful ... but it is to say that in the 
light of pre-existing law the unlawfulness must be apparent." 
Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations 
omitted).

 Applying this standard, the district court dismissed Har-
bury's access to courts claim because it includes no allegation 
of "nefarious conduct," such as manufacturing false evidence 
or destroying or refusing to collect evidence. See Harbury, 
No. 96-00438 at 19-20. Harbury claims only that defendants 

denied knowledge of Bamaca's torture and made "allegedly 
disingenuous overtures to assist her." See id. at 20. Because 
of this, and because State Department and NSC defendants 
did not conceal details about "local crimes" they were charged 
with investigating, but rather information about a "high-
ranking commander of the Guatemalan National Revolution-
ary Union resistance forces" who had been captured during 
an armed conflict with the Guatemalan army, the district 
court ruled that it "[could not] hold that Ambassador McAfee, 
NSA Lake, or the unnamed State Department and NSC 
defendants would have reasonably known that they [had to] 
be forthcoming in discussing the intelligence that they had 
received about Bamaca." Id. at 20-21.

 We read Harbury's complaint quite differently. For one 
thing, as we have already shown, Harbury alleges not that 
defendants violated an affirmative duty to provide informa-
tion, but that they affirmatively misled her. See supra at 20. 
Furthermore, defendants misled her, she alleges, precisely 
because they feared that if they gave her accurate informa-
tion about Bamaca's fate, she might sue them. The relevant 
inquiry in Harbury's case, then, is this: would an objectively 
reasonable official have thought it clearly unconstitutional to 
affirmatively mislead Harbury for the express purpose of 
preventing her from filing a lawsuit? See Crawford-El v. 
Britton, 951 F.2d 1314, 1317 (D.C. Cir. 1992).

 Before answering this question, we must dispose of the 
Government's argument that under Harlow, any inquiry into 
defendants' purpose in misleading Harbury is irrelevant to 
their qualified immunity defense. It is true that Harlow 
holds that an official's "subjective good faith" is irrelevant to 
evaluating a claim of qualified immunity. See Harlow, 457 
U.S. at 815-19. But we have understood Harlow principally 
to prevent inquiry into officials' knowledge or beliefs about 
the legality of their conduct. Except in national security 
cases--and the Government has not yet raised a national 
security defense in this case--we have not read Harlow to 
prohibit inquiry into an official's motives unrelated to knowl-
edge of the law, when "a bad [motive] could transform an 
official's otherwise reasonable conduct into a constitutional 

tort." See Crawford-El, 951 F.2d at 1317; see also Halperin 
v. Kissinger, 807 F.2d 180, 186 (D.C. Cir. 1986) ("No court, as 
far as we are aware, has extended Harlow's proscription of 
subjective inquiry beyond the issue of knowledge of the law 
and intent related to knowledge of the law, except in a 
national security context."). The Supreme Court, moreover, 
has not only confirmed that Harlow allows inquiry into intent 
unrelated to knowledge of the law, but also held that plaintiffs 
making constitutional claims based on improper motive need 
not meet any special heightened pleading standard. See 
Crawford-El v. Britton, 523 U.S. 574 (1998).

 Returning to the question before us--Should it have been 
clear to an objectively reasonable official that affirmatively 
misleading Harbury for the purpose of preventing her from 
filing a lawsuit would violate her constitutional rights?--we 
think the answer is plainly yes. Not only have five of our 
sister circuits held that cover-ups that conceal the existence 
of a cause of action (or make it difficult to prosecute one) 
infringe the constitutional right of access to courts, and not 
only are we unaware of any contrary decision, but we think it 
should be obvious to public officials that they may not affir-
matively mislead citizens for the purpose of protecting them-
selves from suit. Harlow developed qualified immunity to 
protect public officials from "insubstantial lawsuits" that 
threatened to "[divert] official energy from pressing public 
issues" and "[deter] able citizens from acceptance of public 
office," as well as to ensure that these officials could exercise 
their discretion without fear of suit. See Harlow, 457 U.S. at 
814. Qualified immunity was never intended to protect public 
officials who affirmatively mislead citizens for the purpose of 
protecting themselves from being held accountable in a court 
of law. Joining our sister circuits, we therefore hold that 
when public officials affirmatively mislead citizens in order to 
prevent them from filing suit, they violate clearly established 
constitutional rights and thus enjoy no qualified immunity.

 IV

 In conclusion, we reiterate what we said at the outset: 
because the district court dismissed Harbury's complaint 

pursuant to Federal Rule of Civil Procedure 12(b)(6), our task 
is to assess neither the strength nor plausibility of Harbury's 
allegations, but to determine whether, assuming the truth of 
her allegations, "[she] can prove [any] set of facts in support 
of [her] claim which would entitle [her] to relief." Conley, 
355 U.S. at 45-46. Applying that standard, we reverse the 
district court's dismissal of Harbury's access to courts claim 
and remand for further proceedings. In all other respects we 
affirm.

 So ordered.