# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued March 11, 2014          Decided May 6, 2014

No. 12-5228

KEITH THOMAS,
APPELLANT

v.

ERIC H. HOLDER, JR., U.S. ATTORNEY GENERAL REAL PARTY
IN INTEREST AND ANTHONY HEDGPETH, WARDEN SALINAS
VALLEY STATE PRISON,
APPELLEES

―――――

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00459)

―――――

On Motion for Reconsideration

―――――

*Sat Nam S. Khalsa*, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With him on the briefs was *Anthony F. Shelley*, appointed by the court.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: TATEL, SRINIVASAN, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: After Appellant, a state prisoner, failed to respond to our order to show cause why he should not be compelled to pay a required filing fee, we dismissed his appeal for failure to prosecute. Now supported by amicus counsel, Appellant has moved for reconsideration of our dismissal, contending that requiring him to pay a filing fee would unconstitutionally deprive him of his right to access the courts. Without reaching this constitutional question, we deny the motion because the claims Appellant raises in his appeal are devoid of merit and reinstating the appeal would therefore be a pointless gesture.

## I.

Appellant Keith Thomas is an inmate of Salinas Valley State Prison in California. Acting *pro se*, he filed a petition for writ of mandamus in the district court, seeking to compel Attorney General Eric Holder to reclassify marijuana as a Controlled Substances Act (CSA) Schedule V controlled substance. Schedule V encompasses those drugs with a "low potential for abuse," a "currently accepted medical use in treatment," and little potential for "physical dependence or psychological dependence." 21 U.S.C. § 812(b)(5). By contrast, Schedule I—marijuana's current classification—is reserved for drugs with a "high potential for abuse," "a lack of accepted safety for use . . . under medical supervision," and "no currently accepted medical use in treatment in the United States." *Id.* § 812(b)(1). Alleging that he suffered from arthritis and osteoarthritis, Thomas claimed that marijuana's

Schedule I classification prevented him from obtaining the drug in order to treat his pain. The district court denied Thomas's petition for mandamus, holding that the Attorney General "has the discretion to reclassify a controlled substance, and where the action petitioner seeks to compel is discretionary, he has no clear right to relief and mandamus therefore is not an appropriate remedy." *Thomas v. Holder*, No. 12-0459, slip op. at 2 (D.D.C. Mar. 26, 2012).

Thomas appealed. As he had before the district court, he moved to proceed *in forma pauperis*, or IFP, which would enable him to pay any filing fees in installments over time or possibly not at all. *See* 28 U.S.C. § 1915(b). Under what is known as the three-strikes provision of the Prison Litigation Reform Act (PLRA), however, a prisoner may not proceed *in forma pauperis* "if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." *Id.* § 1915(g). Thomas has three strikes under the PLRA. *See Thomas v. Bush*, No. 06-5015, 2006 U.S. App. LEXIS 22767, at 1–2 (D.C. Cir. Sept. 6, 2006). We therefore issued an order requiring Thomas to show cause within thirty days "why he should not be required to pay the full appellate filing fee before the court will consider his appeal." When Thomas failed to respond, we dismissed the case for lack of prosecution. *See* D.C. Circuit Rule 38 (providing that the court may impose "[s]anctions" such as "dismissal for failure to prosecute").

Subsequently, Thomas filed two motions that we have construed as requests for reconsideration of our dismissal of his appeal. *See Thomas v. Holder*, No. 12-5228 (D.C. Cir.

Apr. 15, 2013). In these filings, he claimed that he had been "in the hospital for [a] mental health crisis" and had been put on "psychotropic medication." He also appeared to contend that his inability to pay the required filing fee had prevented him from pursuing his appeal, asserting that he had "no way to send a forma pauperis to the court to pay for the filing fee."

In response to these filings, we appointed amicus counsel "to present arguments in favor of appellant's position" and ordered both amicus and the government to brief "whether the 'three-strikes provision' of the [PLRA] unconstitutionally denies indigent prisoners access to the courts," as well as any other issues they saw fit to address. *Id.* They have ably performed that task.

## II.

Amicus and the government dispute several issues, among them whether Thomas would have standing to press the claims he raised in his appeal were we to reinstate it, and whether depriving him of the ability to proceed *in forma pauperis* would violate the Due Process or Equal Protection Clauses of the Constitution. But we have no need to consider these questions because we agree with the government that there is an independent reason to deny Thomas's motion for reconsideration: his underlying claims are wholly without merit.

We begin with the principles—or more accurately, the lack of principles—that govern this court's disposition of motions for reconsideration. No Federal or Circuit Rule expressly gives movants like Thomas any particular entitlement to have their appeals reinstated. Although D.C. Circuit Rule 27(e)(2) provides that a party "adversely affected by an order of the clerk disposing of a [procedural] motion may move for reconsideration thereof within 10 days," it says

nothing about the circumstances in which such a motion will be granted. According to the government, the situation we face here is analogous to that confronting a district court considering a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b). In that context, it is well-established that movants must show that their underlying claims have at least some merit. They need not meet a particularly "high bar" to satisfy this threshold requirement, but they must provide at least "a hint of a suggestion" that they might prevail. *Marino v. DEA*, 685 F.3d 1076, 1080 (D.C. Cir. 2012) (internal quotation marks omitted). This is so even if the claims were not originally resolved on the merits but were instead dismissed for failure to prosecute, as they were here. In *Lepkowsi v. Department of the Treasury*, 804 F.2d 1310 (D.C. Cir. 1986), for example, the district court had dismissed the case after the plaintiff failed to respond to the defendant's motion to dismiss, and then later denied the plaintiff's Rule 60(b) motion, which had argued that this failure should be deemed excusable neglect. *Id.* at 1313. We affirmed, holding in part that "motions for relief under Rule 60(b) are not to be granted unless the movant can demonstrate a meritorious claim or defense; we cannot escape the fact that the complaint and the proposed opposition were insufficient as a matter of law." *Id.* at 1314; *see also id.* at 1321 (Robinson, J., concurring) (parting ways with the majority as to whether there had been excusable neglect, but agreeing that denial should be affirmed because the claim "ha[d] little or no chance of ultimately surviving"). Likewise, in *Murray v. District of Columbia*, 52 F.3d 353 (D.C. Cir. 1995), the district court had dismissed the case after the plaintiffs failed to oppose a motion to dismiss, then denied their motion for reconsideration. *Id.* at 355. Affirming, we concluded that we had no need to consider the plaintiffs' argument that their attorneys never received notice of the motion to dismiss, as plaintiffs had failed to satisfy the "threshold requirement" of

showing that there was some "reason to believe that vacating the judgment will not be an empty exercise or futile gesture." *Id.*; *see also*, *e.g.*, *Norman v. United States*, 467 F.3d 773, 775 (D.C. Cir. 2006) (affirming denial of reconsideration of dismissal for failure to prosecute because there was no "underlying meritorious claim") (internal quotation marks omitted).

We believe the same prerequisite should operate in this case. The requirement that parties seeking Rule 60(b) relief show some prospect of succeeding on the merits flows from the basic principle that courts should revive previously-dismissed claims only if they have some reason to believe that doing so will not ultimately waste judicial resources. *See Murray*, 52 F.3d at 355. This principle holds true here: reviving Thomas's appeal will constitute an "empty exercise or futile gesture," *id.*, unless Thomas has some possibility of prevailing.

Indeed, we see two especially good reasons to condition the grant of Thomas's motion for reconsideration on his demonstrating a chance of succeeding on the merits. First, Thomas claims that his appeal should be reinstated because the PLRA's three-strikes provision is unconstitutional as applied to him. For this court to reach out and decide this difficult and important question simply to reinstate a pointless appeal would violate the norm of constitutional avoidance to which we generally adhere. *See Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000) ("Federal courts should not decide constitutional questions unless it is necessary to do so."). Second, the PLRA provides that a court "shall dismiss" an IFP litigant's case if the "appeal . . . is frivolous or malicious . . . [or] fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2). Thus, even were we to grant Thomas IFP status and reinstate his appeal, we would then have to

promptly dismiss the case if his claims lack merit. What could be a more "futile gesture" than reinstating an appeal only to then immediately dismiss it?

Amicus concedes that we must deny the motion for reconsideration if Thomas's underlying claims lack merit, but insists that his claims actually have merit. We disagree.

Recall that Thomas seeks to compel the Attorney General to reclassify marijuana from Schedule I to Schedule V, arguing primarily that the CSA requires such action because of the drug's accepted medical uses. Significantly, however, he seeks such relief by writ of mandamus, "a drastic remedy" reserved for "extraordinary situations." *In re Papandreou*, 139 F.3d 247, 250 (D.C. Cir. 1998) (internal quotation marks omitted). Mandamus may be granted only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *Council of & for the Blind of Delaware County Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983) (en banc). Mandamus petitioners can satisfy neither of the first two requirements if the act they seek to compel is discretionary, as government officials have no clear duty to perform such acts and petitioners have no clear right to compel them to do so. *See Heckler v. Ringer*, 466 U.S. 602, 616–17 (1984). Here, as the district court explained, the Attorney General has at least some discretion in determining whether and how to classify marijuana. Although, as amicus emphasizes, the statute does provide that the Attorney General "shall" ensure that the provisions of the CSA are applied to the substances as categorized, it also provides that the Attorney General "may" decide whether to transfer a particular substance from one classification to another— precisely the relief Thomas seeks. *See* 21 U.S.C. § 811. Indeed, confirming that the Attorney General could not

possibly have a clear duty to act as Thomas demands, this court held a little more than a year ago that the agency to which the Attorney General has delegated his CSA reclassification authority engaged in no abuse of discretion when it refused to reclassify marijuana as appropriate for medical use. *See American for Safe Access v. DEA*, 706 F.3d 438, 449–52 (D.C. Cir. 2013). To the extent Thomas also contends that mandamus is warranted because the Attorney General has, in violation of the Eighth Amendment, acted with "deliberate indifference" to Thomas's suffering, *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976), this claim also necessarily fails. If the Attorney General could properly conclude that marijuana is not appropriate for medical use, he certainly has no clear duty to see that it is provided to Thomas specifically.

Because Thomas has failed to provide even a "hint of a suggestion" that he might succeed, *Marino*, 685 F.3d at 1080, we see no reason to reinstate his appeal. Accordingly, his motion for reconsideration is denied.

*So ordered.*

TATEL, *Circuit Judge*, concurring: Having written the court's opinion, I obviously agree that we have no need to assess the constitutionality of the Prison Litigation Reform Act's "three-strikes" provision. But because at our direction court-appointed amicus and the government have fully briefed that issue, and because this court, though regularly applying the three-strikes provision, has yet to fully examine its constitutionality, I write separately to explain my own doubts on that question.

A bit of background is in order. When Congress enacted the Prison Litigation Reform Act (PLRA) in 1996, it vastly changed the scope of *in forma pauperis* (IFP) status for both state and federal prisoners seeking to bring claims in federal court. Pursuant to section 1915(b), prisoners granted leave to proceed IFP are, unlike non-prisoner IFP litigants, still generally required to pay filing fees. The statute, however, allows them to pay the fees in installments over time—potentially over a very long period of time. *See* 28 U.S.C. § 1915(b)(1)–(2). And for prisoners unable to pay even these partial installments, the statute includes a "safety valve" provision: "In no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial fee." *Id.* § 1915(b)(4).

The PLRA's three-strikes provision, section 1915(g), imposes more onerous burdens on those prisoners who have "on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted." *Id.* § 1915(g). Unless such prisoners file a habeas petition attacking the fact or duration of their confinement—which is not a "civil action" to which the PLRA applies, *see Blair-Bey v. Quick*, 151 F.3d 1036, 1039–

42 (D.C. Cir. 1998)—or allege that they are in "imminent danger of serious physical injury," they are denied IFP status altogether. 28 U.S.C. § 1915(g). The statute contains no safety valve for such prisoners.

The three-strikes provision implicates two interrelated lines of constitutional decisions. In the first, the Supreme Court has held that filing and similar fees must be waived for indigent litigants who raise certain types of claims. In the foundational case of *Griffin v. Illinois*, 351 U.S. 12 (1956), a four-Justice plurality held that a state violated both due process and equal protection by requiring indigent convicted defendants to pay a fee for the transcripts needed to appeal their convictions. *See id.* at 15, 18–19 (plurality opinion). Because criminal defendants have no constitutional right to appeal their convictions in the first place, the decision appears to have been grounded primarily in equal protection principles: if a state affords some defendants a right to appeal it must afford all defendants that same right. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 111, 120 (1996) ("'[M]ost decisions in this area,' we have recognized, 'rest on an equal protection framework,' . . . for . . . due process does not independently require that the State provide a right to appeal." (internal citations and alterations omitted) (quoting *Bearden v. Georgia*, 461 U.S. 660, 665 (1983)); *see also Griffin*, 351 U.S. at 21–23 (Frankfurter, J., concurring in the judgment) (relying principally on the Equal Protection Clause). The Court has since extended these same principles to habeas petitions, *see Smith v. Bennett*, 365 U.S. 708, 709 (1961) ("to interpose any financial consideration between an indigent prisoner of the State and his exercise of a state right to sue for his liberty is to deny that prisoner the equal protection of the laws"), as well as to litigation involving certain fundamental interests, such as obtaining a divorce, *see Boddie v. Connecticut*, 401 U.S. 371, 374 (1971), or appealing the

termination of parental rights, *see M.L.B.*, 519 U.S. at 123. But the Court has declined to hold that the Constitution requires the waiver of fees when indigent litigants seek to vindicate less fundamental interests, such as securing a discharge in bankruptcy, *see United States v. Kras*, 409 U.S. 434, 445–46 (1973), or appealing a denial of welfare benefits, *see Ortwein v. Schwab*, 410 U.S. 656, 659–60 (1973) (per curiam).

In the second line of cases, the Court has addressed the rights of prisoners to access the courts. *Griffin* and *Smith*— which, again, struck down fees imposed on defendants challenging their convictions on direct appeal and habeas, respectively—are among the decisions that first established this right of access. *See Lewis v. Casey*, 518 U.S. 343, 354 (1996). But fees are hardly the only barriers that stand between prisoners and the courts, and the Supreme Court has held that the right of access also includes the right to "adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977). The Court has also made clear that prisoners' right of access extends beyond litigation attacking their convictions and sentences. In *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court, perceiving in this regard "no reasonable distinction between" habeas and civil rights actions, *id.* at 580, held that the right encompasses prisoner litigation seeking to vindicate "basic constitutional rights," *id.* at 579. Thus, although the Constitution "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims," it does require that inmates be provided "[t]he tools" they "need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Lewis*, 518 U.S. at 355. Moreover, to trigger

the right of access, these claims must qualify as nonfrivolous. *See id.* at 352 n.2, 353 n.3.

This court applied these constitutional principles in *In re Green*, 669 F.2d 779 (D.C. Cir. 1981), a case involving an indigent prisoner categorically denied IFP status. The plaintiff in *Green* had filed an incredible number of frivolous lawsuits, apparently trying to "deliberately flood[] the courts with his complaints and petitions . . . in a vain attempt to gain his release from prison." *Id.* at 782. The district court responded by issuing an order providing that the prisoner could file an action in this district only if he first paid all filing fees upfront and made a deposit of $100 as security for costs. *Id.* at 784. We vacated this order for two separate and independent reasons. First, in prospectively denying IFP status in all future cases, the order violated section 1915(a) of the IFP statute, which, we held, required that a district court exercise its discretion to determine whether to grant leave to proceed IFP in each case. *Id.* at 786. Second, and of more relevance here, we held that the order violated Green's right of "meaningful access to the courts" because it "erect[ed] a potentially prohibitive financial barrier that encompasses all civil suits including habeas corpus petitions as well as those involving a fundamental constitutional right." *Id.* We explained: "because Green *cannot* comply with the court's order if he is without the necessary funds, the order effectively denies Green any and all access to the district court." *Id.* And because "[e]ven a new, nonfrivolous claim submitted in good faith would not be heard if Green could not meet the filing fee and cash deposit," the district court's order was unconstitutional. *Id.*

Of course, nowhere in *Green* did we hold that *any* requirement that a prisoner pay filing fees will necessarily be unconstitutional. Indeed, in *Tucker v. Branker*, 142 F.3d 1294 (D.C. Cir. 1998), we distinguished *Green* and upheld the

constitutionality of those PLRA provisions that require non-three-strikes prisoners to generally pay some filing fees. Characterizing *Green* as a case with "extreme" facts, we explained that the fees the PLRA imposes on IFP prisoners are "much less burdensome." *Id.* at 1299. In particular, we emphasized that because the statute allows payment by installments, the required fees "never exact[] more than 20% of an indigent prisoner's assets or income." *Id.* at 1298. And given the safety valve provision, "even a destitute prisoner may file his suit if he wants to, without having to pay any initial fee." *Id.* at 1297–98.

I struggle to see how we could similarly distinguish *Green* in a case in which an indigent prisoner challenges the PLRA's three-strikes provision. The conditions the three-strikes provision imposes mirror the "extreme" facts of the order struck down in *Green*. Like the order in *Green*, not only does the three-strikes provision require prisoners to pay all filing fees upfront, but it applies even to claims involving fundamental constitutional rights. If prisoners have no ability to pay these fees, then, as in *Green*, they face a "total barrier" to bringing their claims—again, three-strikers enjoy no statutory safety valve. *Green*, 669 F.2d at 785. The financial conditions at issue in *Green* differ from those imposed by the three-strikes provision in only one respect: the *Green* petitioner was also required to pay a $100 deposit. This difference, however, is constitutionally insignificant. Green was deprived of his right to meaningful access to the courts not because of the additional $100 deposit, but simply because "if he [was] without the necessary funds," whatever that sum might be, he would be completely unable to file a claim. *Id.* at 786. The same is true of prisoners subject to the PLRA's three-strikes provision.

The government attempts to distinguish *Green* in several ways. First, it points out that "*Green* predates the passage of the PLRA by approximately fifteen years." Appellees' Br. 43. But clearly, the fact that a statute postdates a constitutional decision cannot somehow render that statute constitutional. Otherwise, freedom of choice might have been constitutional just because it emerged following *Brown v. Board of Education*, 347 U.S. 483 (1954). *But see Green v. County School Board of New Kent County*, 391 U.S. 430 (1968).

The government further contends that the three-strikes provision, unlike the *In re Green* order, "only blocks access to the court . . . without prepayment of fees for claims not brought by prisoners in imminent danger of serious bodily injury." Appellees' Br. 43. To be sure, the three-strikes provision's imminent danger exception may permit prisoners to bring *some* of the claims they have a constitutional right to bring. But what about prisoners advancing constitutional claims that involve no imminent danger of serious bodily injury, such as free speech, religious liberty, or right to refuse medical treatment claims? The right to meaningful access to the courts extends as well to these sorts of claims that seek to vindicate "fundamental constitutional rights." *Lewis*, 518 U.S. at 351 (internal quotation marks omitted); *Wolff*, 418 U.S. at 579. The fatal flaw in the *Green* order was that it would have prevented the prisoner from filing claims that he had a constitutional right to access the courts in order to file. *See Green*, 669 F.2d at 786. The three-strikes provision suffers from the very same deficiency.

The government also repeatedly asserts that IFP status is a "privilege" and not a "right." *E.g.*, Appellees' Br. 25. As support for this proposition, it relies primarily on *In re Sindram*, 498 U.S. 177 (1991). In that case, the Supreme Court, reasoning that it has "a duty to deny *in forma pauperis*

status to those individuals who have abused the system," ordered that an especially abusive litigant be denied IFP status in "all future petitions for extraordinary relief." *Id.* at 180. As we have since held, *Sindram* and cases like it overruled *Green*'s *statutory* holding that section 1915(a) prohibits a court from imposing "prospective denials of IFP status." *Hurt v. SSA*, 544 F.3d 308, 310 (D.C. Cir. 2008). But the Supreme Court's order in *Sindram*, like other orders the Court imposed in similar cases, *see In re Anderson*, 511 U.S. 364, 365 (1994), was limited, applying only to requests for extraordinary relief from the Court itself, thus closing just one of the litigant's potential avenues of access to that or any court. *Sindram* therefore has little bearing on *Green*'s separate *constitutional* holding, which remains binding in this Circuit. *See Aamer v. Obama*, 742 F.3d 1023, 1033 (D.C. Cir. 2014) ("[A]lternative grounds for a decision are nonetheless precedential."). The same goes for our own decisions denying litigants leave to proceed IFP in circumstances that did not require us to consider whether denial would prevent a prisoner from raising a nonfrivolous constitutional claim. *See Mitchell v. Federal Bureau of Prisons*, 587 F.3d 415, 417 (D.C. Cir. 2009) (denying application to proceed IFP of prisoner who complained of improper notation in administrative files and made vague claims regarding need for medical treatment); *Hurt*, 544 F.3d at 310 (prospectively denying "non-incarcerated litigant[]" privilege of proceeding IFP); *Butler v. U.S. Department of Justice*, 492 F.3d 440, 445–47 (D.C. Cir. 2007) (denying prisoner leave to proceed IFP in advancing a Freedom of Information Act claim). Thus, although IFP status may well be a "privilege" for most litigants raising most types of claims, the Supreme Court has unequivocally held that waiver of filing fees is in some cases constitutionally required, *see, e.g.*, *Smith*, 365 U.S. at 712; *Griffin*, 351 U.S. at 18–19, and our decision in *Green* makes clear that prisoners have a right to a reduction in fees if

necessary to enable them to vindicate fundamental constitutional rights, *see Green*, 669 F.2d at 786.

Consistent with the foregoing, several Courts of Appeals have left open the possibility that a prisoner might bring a successful as-applied challenge to the PLRA's three-strikes provision. For example, although the Eleventh Circuit rejected a claim that the three-strikes provision impeded the right to access the courts, it did so only after observing that the plaintiff's "well-pled allegations . . . plainly advance no cognizable fundamental interest." *Rivera v. Allin*, 144 F.3d 719, 724 (11th Cir. 1998). Likewise, the Ninth Circuit held that "*where a fundamental right is not at stake*, § 1915(g) does not infringe upon an inmate's meaningful access to the courts." *Rodriguez v. Cook*, 169 F.3d 1176, 1180 (9th Cir. 1999) (emphasis added); *accord White v. State of Colorado*, 157 F.3d 1226, 1233–34 (10th Cir. 1998); *Carson v. Johnson*, 112 F.3d 818, 821 (5th Cir. 1997).

To be sure, other Circuits have held as a categorical matter that the three-strikes provision does not infringe prisoners' right of access to the courts. These decisions rest on two primary rationales, both of which are foreclosed in this Circuit by *Green* and are in any event unconvincing.

First, some courts have reasoned that a three-strikes litigant may simply find a way to pay the required fees. As the Seventh Circuit put it, prisoners may pay "using assets on hand," "[s]ave up in advance," "[b]orrow the filing fee from friends or relatives," or "[b]orrow the filing fee from a lawyer." *Lewis v. Sullivan*, 279 F.3d 526, 530 (7th Cir. 2002); *accord Higgins v. Carpenter*, 258 F.3d 797, 800 (8th Cir. 2001). These ways of cobbling together filing fees were, however, presumably equally available to the petitioner in *Green*, and we nonetheless held that the financial burden

imposed by the district court's order—again, essentially the same as that imposed by the three-strikes provision—effectively deprived him of access to the courts. *See Green*, 669 F.2d at 786. In so doing, we adhered to the logic the Supreme Court has applied in holding that even minimal fees must sometimes be waived, logic that I believe better reflects the reality prisoners face. As the Court explained in *Smith*, "While $4 is, as the State says, an 'extremely nominal' sum, if one does not have it and is unable to get it the fee might as well be $400." 365 U.S. at 712.

Second, other courts have held that the three-strikes provision does not deny indigent prisoners access to the courts because such prisoners may simply "[s]ue in state rather than federal court." *Lewis*, 279 F.3d at 530; *accord Abdul-Akbar v. McKelvie*, 239 F.3d 307, 318 (4th Cir. 2001) (en banc); *Wilson v. Yaklich*, 148 F.3d 596, 605 (6th Cir. 1998). But prisoners may be unable to bring some claims in state court. *See* Richard S. Arnold, *The Power of State Courts to Enjoin Federal Officers*, 73 Yale L.J. 1385 (1964) (discussing limits on state courts' ability to entertain claims against federal officials). And in any event, the plaintiff in *Green* was also capable of filing claims in state court, as he in fact had. *See Green*, 669 F.2d at 781. Although we never said so expressly, our conclusion that the *Green* petitioner had been deprived of his right to meaningful access likely reflected, in part, our application of the equal protection principles that underlie that right: Green was entitled to litigate his claims in *this* court because other litigants may do so. Such reasoning would echo the Supreme Court's rejection of the argument that a state could impose filing fees on indigent habeas petitioners because they could simply seek the writ in a federal court. "But even though this be true," the Court declared, "it would ill-behoove this great State [(Iowa)], whose devotion to the equality of rights is indelibly stamped

upon its history, to say to its indigent prisoners seeking to redress what they believe to be the State's wrongs: 'Go to the federal court.'" *Smith*, 365 U.S. at 713.

For these reasons, I have grave doubts that the PLRA's three-strikes provision may be constitutionally applied to indigent prisoners who seek access to the courts in order to bring claims involving fundamental constitutional rights. In the appropriate case, this court should address this unsettled issue. In so suggesting, I fully understand that Congress was responding to a very real problem when it enacted the PLRA. It is undoubtedly true that much prisoner litigation is not only frivolous and abusive, but also imposes substantial costs on the federal courts. That said, it is also undoubtedly true that some prisoners have legitimate constitutional claims. *See, e.g.*, *Brown v. Plata*, 131 S. Ct. 1910 (2011) (upholding order requiring California to reduce prison overcrowding that had produced pervasive constitutional violations). So while faithfully honoring Congress's goal of reducing abusive litigation, the federal courts remain constitutionally obligated to hear such claims, for "[o]nly by zealously guarding the rights of the most humble, the most unorthodox and the most despised among us can freedom flourish and endure in our land." *Bridges v. Wixon*, 326 U.S. 135, 166 (1945).